GERALD M. SUESS, APPELLEE, V. LEE SAPP LEASING, INC.,
APPELLANT.

428 N.W.2d 899

Filed September 16, 1988.    No. 86-760.

Thomas R. Wolff for appellant.

Pamela K. Black, of North & Black, P.C., for appellee.

BOSLAUGH, CAPORALE, and GRANT, JJ., and BUCKLEY, D.J.,
and COLWELL, D.J., Retired.

BOSLAUGH, J.

This case arises out of a controversy concerning an employment contract. The plaintiff, Gerald M. Suess, was employed as manager of the defendant, Lee Sapp Leasing, Inc., from March 1, 1983, until his resignation on November 16, 1984. The plaintiff brought this action to recover amounts he claims were due him under the contract of employment but which the defendant refused to pay.

The plaintiff had been employed in the leasing industry since 1971, and was employed by Custom Leasing. Apparently, he expected to resign from Custom Leasing on January 31, 1983, but instead, was terminated on December 31, 1982.

At some point, the plaintiff was contacted by an employment agency representing the defendant and was asked about any interest he might have in working for the defendant. The plaintiff first met with Lee Sapp, the president and principal stockholder of the defendant, in October of 1982. Subsequently, he had several additional meetings with Sapp prior to accepting employment. According to the plaintiff, he and Sapp reached an agreement in November of 1982 that the plaintiff would begin employment with the defendant on March 1, 1983.

There was no written contract of employment, and the parties disagree as to what were the terms of the contract of employment.

The plaintiff describes the November 1982 employment agreement between himself and the defendant as "pretty simple." The plaintiff testified that he was to receive a 20-percent ownership share in the company, subject to purchasing the stock at its book value as of December 31, 1982. His acquisition of ownership was also subject to his ability to perform adequately for the company during the first 6 months of 1983. The plaintiff acquired his stock in August 1983, paying for it by a promissory note which remained unpaid at the time of trial.

The plaintiff claims he was to receive 10 percent of the profits generated by the business, in addition to depreciation taken on a straight line basis. According to the plaintiff, the depreciation was to be added back into the "bottom line" prior to calculating his 10-percent share of the profits.

Besides profits, the plaintiff was to receive $20,000 as a base salary, plus bonuses to be paid on a quarterly basis, based on a percentage of the leases generated by him. Apparently, however, the exact percentage was never determined by the parties.

Although his employment did not commence until March of 1983, the plaintiff did some work for the defendant in January of 1983. The plaintiff was provided with an office at the company, a company car, and credit cards. The plaintiff "brokered" approximately $600,000 in leases for the defendant in January 1983, which resulted in a $40,000 profit to the leasing company. The defendant had agreed to pay the plaintiff 30 percent of the leases that he generated in January, and the plaintiff admits that he was paid his 30-percent share on "the first couple leases," but then only a 20-percent share. However, the plaintiff acknowledged that the arrangement to broker leases in January 1983 was an independent arrangement aside from his employment to begin March 1, 1983, and he makes no claim for any additional compensation for services performed in January of 1983.

Upon beginning his employment on March 1, 1983, the plaintiff and Lee Sapp renegotiated the employment agreement. The new agreement provided for an annual salary of $40,000, 10 percent of the bottom line profits plus any depreciation generated by the plaintiff, 3 weeks' vacation, a company car, expenses, health insurance, and 20 percent ownership of the company. The plaintiff admitted that he could be fired at will and had no right to expect continued employment. In turn, he recognized that he was not committed to employment with the defendant for any specific period or term.

The plaintiff testified that he and Lee Sapp discussed tax deferment items. According to the plaintiff, the tax deferment items were to be added back into the business profits before calculating his 10-percent share of the profits. One such item was rent increases. According to the plaintiff, the parties also determined that profits would be calculated by using internal financial statements prepared by the company on a monthly basis. According to Suess, he and Sapp analyzed each statement

on a monthly basis, and at that time, the plaintiff would calculate the depreciation due him on the leases he had generated and he would then add this amount to the "bottom line" figure. In addition to adding back the depreciation, the plaintiff stated that he would add in any expenses he found to be extraordinary. However, the plaintiff admitted that he had no agreement with Lee Sapp that Sapp would defer the determination of any of the expenses to him.

The plaintiff claims that in November of 1983, Lee Sapp told him that his 10 percent of the profits was going to be paid out and that the plaintiff was to produce documents indicating the depreciation he had created, and the plaintiff and Sapp would together arrive at a figure which would compensate the plaintiff from March through October 1983. As a result, the plaintiff prepared what is described in the record as exhibit 31. This document shows depreciation generated by the plaintiff from March to October of 1983 as $25,606. The plaintiff then added this amount to $174,676.34, the profit shown on the October 31 internal financial statement, resulting in a figure of $200,282. The plaintiff testified that when these figures were shown to Lee Sapp, Sapp agreed to pay the plaintiff $20,000 and that additional matters regarding profits for November and December of 1983 would be settled on the last day of 1983. The plaintiff testified that he understood that the matters to be settled at the year's end included "the rent expense and those types of things [that] should have been added in."

Lee Sapp, on the other hand, testified that the plaintiff was in financial trouble in November of 1983 and came to Sapp for assistance. After a review of his work for the company from March to October, Sapp agreed to give the plaintiff $20,000 as a gift, which money had absolutely no relation to profits and was not based on any financial statement or depreciation generated by the plaintiff. The plaintiff denies that he asked Lee Sapp for a $20,000 bonus even though that may be reflected in the minutes of a November 1983 board meeting.

Lee Sapp testified that an employee handbook, in effect during the time of the plaintiff's employment, required an employee to work for the company for an entire fiscal year before any profits would be paid to the employee. Lee Sapp

contended that because the plaintiff had not been an employee of the leasing company for 1 fiscal year at the time he received the $20,000, the money was not to be considered profits.

When asked on cross-examination whether he was aware of the written policy regarding 1 year of employment prior to receiving a share of the profits, the plaintiff stated, "That was never discussed."

The plaintiff talked with Lee Sapp in December of 1983 about the profits due him for November and December of 1983. According to the plaintiff, Sapp told him at that time that there were no profits for those months; that in November of 1983, he had been paid a $20,000 *bonus* that was charged back against November's profits, and that, in addition, a $40,000 dividend had been declared in December 1983 as well as a $5,000 bonus to Sapp, both of which were charged back against December profits.

The plaintiff claims it was his understanding that bonuses were to be paid *after* his 10 percent of the profits had been determined. He did agree, however, that Lee Sapp had told him that he would not be paid profits for November and December because, as chief executive officer, Sapp was going to consider October 31 the year's end for 1983. According to the plaintiff, the company's fiscal year normally ran from January 1 to December 31 of each year, and from the standpoint of the board of directors, it had never formally been changed. The plaintiff claims that he would have realized an additional $5,000 in profits had the fiscal year continued through December 1983. The company's year-end statement showed the fiscal year as ending December 31, 1983. When the plaintiff complained about this matter to Lee Sapp, Sapp responded, "That's the way I do it."

The plaintiff continued to work for the defendant in 1984, and, according to him, he met monthly with Lee Sapp to go over the company's profit-and-loss statements. At this time, the plaintiff would again add in the depreciation due him as well as unauthorized expenses. The plaintiff admits there are no financial statements which relate to these claimed monthly discussions.

In the summer of 1984, Lee Sapp and the plaintiff had a

disagreement about depreciation. Sapp, at that time, according to the plaintiff, was not going to pay him any further depreciation for leases that he might generate. The plaintiff claims that he and Sapp then reached an agreement whereby the plaintiff would be paid for the leases which were in place at the end of 1983 and which continued into the future. The plaintiff claims that the defendant received $8,100 per month of depreciation benefits in 1984 as a result of leases in place in 1983. He claims that Lee Sapp agreed to the $8,100-per-month figure and also agreed that exhibits 31, 34, and 35 list the leases for which the plaintiff claims responsibility. Lee Sapp, however, denied that those exhibits were representative of exclusive accounts of the plaintiff and, instead, claimed that many of the leases were generated by Sapp himself.

According to the plaintiff, in October of 1984, he gave Lee Sapp exhibit 30, showing profits generated by the leasing company for 1984. In addition, the exhibit shows the plaintiff's claims for add-back items for the purpose of determining his 10-percent share of the profits. The plaintiff claims that Lee Sapp did not dispute the figures or add-backs, but Sapp contends that he contested *all* such items.

Due to his repeated disagreements with Lee Sapp, the plaintiff resigned from his employment after working for the defendant for approximately 20 months. The plaintiff maintained his claim for profits for November and December of 1983, as well as for the year 1984. Lee Sapp claimed that since the plaintiff was never employed, in either 1983 or 1984, for an entire fiscal year, he was not entitled to any profits. After quitting in November of 1984, the plaintiff denied ever having been told of the "fiscal year rule." Had he been aware of such a requirement, he stated, he would not have voluntarily terminated his employment in November of 1984.

The matter was tried to the court, which found generally for the plaintiff. The trial court found that the plaintiff should recover $8,238.04 plus interest as wages for 1983; $28,192.86 plus interest as wages for 1984; and attorney fees in the amount of $12,495.67, for a total amount of $57,730.39, including interest. Also, the defendant was ordered to pay $45,234.72 to the clerk for the benefit of the common schools as provided in

Neb. Rev. Stat. § 48-1232 (Reissue 1984). The defendant has appealed.

Since this was a law action, the findings of the trial court have the effect of a verdict of a jury and will not be disturbed on appeal unless clearly wrong. *Havelock Bank v. Woods*, 219 Neb. 57, 361 N.W.2d 197 (1985).

The defendant's first assignment of error is that the trial court erred in applying the provisions of Neb. Rev. Stat. §§ 48-1228 through 48-1232 (Reissue 1984), known as the Nebraska Wage Payment and Collection Act. It contends that the profits the plaintiff claims are due him are not "wages" within the meaning of the act. Section 48-1229(3) defines "wages" as "compensation for labor or services rendered by an employee, *including fringe benefits*, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, *or other basis*." (Emphasis supplied.)

There are two ways in which a share of profits is covered by this section. First, a profit-sharing plan can be considered a fringe benefit. "Fringe benefit" has been defined as: "Side benefits which accompany or are in addition to a person's employment such as paid insurance, recreational facilities, *profit-sharing plans*, paid holidays and vacations, etc. Such benefits are in addition to regular salary or wages and are a matter of bargaining in union contracts." (Emphasis supplied.) Black's Law Dictionary 601 (5th ed. 1979).

Even absent the fringe-benefit clause, the profits claimed by the plaintiff would still be wages within the meaning of the act. Wages are compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, fee, commission, or other basis. In *Ives v. Manchester Subaru, Inc.*, 126 N.H. 796, 498 A.2d 297 (1985), the plaintiff sued his former employer for a percentage of the corporation's profits he claimed were due him pursuant to his employment agreement. On appeal, the court addressed the issue of whether the agreement to pay the plaintiff a share of the profits was an agreement to pay "wages."

> [The pertinent] statute defines wages as "compensation . . . for labor or services rendered by an employee, whether

the amount is determined on a time, task, piece, commission or other basis of calculation." *Id*. It is obvious that the parties' agreement for a share of profits was intended to provide compensation for the plaintiff's labor and services, and it clearly may fall within the statute's reference to compensation calculated on some "other basis." Standing alone these are sufficient reasons to conclude that the plaintiff's share of profits was a wage under the statute, and we so hold. This result is comparable to the holding of the California Court of Appeal applying a similar definition of "wages" in *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 24 Cal. App. 3d 35, 44, 100 Cal. Rptr. 791, 798 (1972), *aff'd* 414 U.S. 117 (1973): "The profit sharing plan is clearly an inducement to employees by a plan through which they benefit financially in proportion to their compensation. Consequently, defendant's contributions to the plan should be considered wages within the meaning of [the] Labor Code."

126 N.H. at 800, 498 A.2d at 300-01.

In *Scoa Industries, Inc. v. Bracken*, 374 A.2d 263 (Del. 1977), the plaintiff-employee had entered into an oral contract under which he was to receive, in addition to a fixed weekly salary, a year-end commission or bonus based upon an agreed percentage of sales. The defendant employer refused to pay any amount. On appeal, the court found that the plaintiff's claim was barred by the 1-year statute of limitations for recovery upon a claim for work, labor, or personal services. The court said:

> The threshold question is whether the year-end bonus constitutes "wages" under 19 *Del.C.* § 1103. The answer is found in 19 *Del.C.* § 1101(a)(2), which defines "wages" as ". . . compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, *commission* or other basis of calculation." (emphasis added) It follows that the statutory causes of action arose at the time of discharge, were untimely filed, and are barred by the Statute of Limitations.

374 A.2d at 264. Thus, the court relied not on the "other basis" provision, but instead found the plaintiff's share of the profits to be a commission. Since the profit-sharing agreement appeared to be tied to the plaintiff's volume of sales, reliance on the "commission" provision was appropriate. In this case, the plaintiff's claim was to 10 percent of the profits of Lee Sapp Leasing, not to 10 percent of the leases sold by the plaintiff. It would be incorrect to call the plaintiff's right to a share of the profits a commission, but it comes within the "other basis" provision.

In *Yuille v. Pester Marketing Co.*, 9 Kan. App. 2d 464, 682 P.2d 676 (1984), two former employees brought a claim for unpaid wages against their former employer, Pester Marketing Company. Under its two-part compensation plan, Pester paid, in addition to an hourly wage, a bonus to its convenience store managers in the amount of $550 per month if the manager worked 54 hours per week and $500 per month if the manager worked 60 hours per week. Slightly lower bonuses were given for managers of gas-only stores. Prior to paying these bonuses, the defendant deducted amounts for cash and inventory shortages, bad checks, and theft losses. The plaintiffs filed claims with the Kansas Department of Human Resources, arguing that the deductions from their bonuses constituted deductions from their wages, which are prohibited by Kansas statute. Wages are defined by Kan. Stat. Ann. § 44-313(c) (1986) as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions."

Unlike Nebraska's, the Kansas statutes go on to define "other basis." Under Kansas administrative regulation 49-20-1(F), "other basis" is

" 'all agreed compensation for services including, but not limited to, profit sharing and fringe benefits for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee. Conditions subsequent to such entitlement, eligibility, accrual or earning resulting in a forfeiture or loss of such earned wage shall be ineffective and unenforceable. . . .' "

9 Kan. App. 2d at 467, 682 P.2d at 680.

The Kansas court found that the bonus was a "wage" within the statutory language, and further found that the deductions constituted a condition subsequent which was prohibited by the statute.

We think the trial court was correct in finding that the Nebraska Wage Payment and Collection Act was applicable in this case.

The defendant's next assignment of error is that the trial court erred in awarding prejudgment interest.

As to the $8,238.04 awarded as profit-sharing compensation for 1983, the court held that the plaintiff should recover interest on that amount at the legal rate of 14 percent for a period of 30 months. As to the $28,192.86 awarded as profit-sharing compensation for 1984, the court held that the plaintiff should recover interest on that amount at the legal rate of 14 percent for a period of 18 months. The total amount of interest awarded was $8,803.82.

Prejudgment interest may not be recovered in Nebraska on an unliquidated claim. A claim is unliquidated where a reasonable controversy exists either as to the right to recover or as to the amount of such recovery. *Otto Farms v. First Nat. Bank of York*, 228 Neb. 287, 422 N.W.2d 331 (1988); *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985). In the present case, the plaintiff's claim was unliquidated under both criteria.

A reasonable controversy existed as to the plaintiff's entitlement to 10 percent of the profits of the defendant. The plaintiff claimed that, pursuant to the oral employment agreement, he was to receive 10 percent of the profits derived by the defendant during his employment. He claimed that the profits were to be determined as of November 1 of each fiscal year and were to be paid to him during the month of November. The defendant, on the other hand, contended that the plaintiff was required to work an entire fiscal year (January 1 to December 31) to be eligible to share in the profits of the company. The plaintiff's employment began in March 1983 and ended in November 1984. In addition, the employment manual for Lee Sapp Enterprises, which includes the defendant, specified that an employee must start and complete a year's

employment to be eligible for a share of the profits.

A reasonable controversy also existed as to the amount of recovery. "[A] claim is liquidated where the evidence, if believed, makes it possible to compute the amount due with exactness without reliance upon opinion or discretion. In such an instance prejudgment interest is recoverable." *Nixon v. Harkins, supra* at 293, 369 N.W.2d at 631.

In this case, it was not possible to compute the share of the profits owed to the plaintiff without opinion or discretion. The plaintiff contended that the profits were to be determined by the monthly in-house financial statement, while the defendant contended that the profits were to be based upon the year-end financial statement as prepared by outside accountants.

The plaintiff claimed that depreciation generated from leases he wrote on behalf of the company was to be added to the profits as shown on the financial statement. The defendant claimed that depreciation was to be added back to determine the plaintiff's share of the profits only after October 1983. The plaintiff also claimed that the increase in rent for the space occupied by the defendant and the amount of bonuses paid to employees should be added back to determine his share of the profits. The defendant disagreed. There was also a dispute as to whether the $20,000 paid to the plaintiff in November of 1983 represented his share of the profits, as he claims, or whether the $20,000 payment was unrelated to any profit-sharing agreement, as the defendant claims. The trial court found that the $20,000 was a bonus, and thus was credited against the amount owed to the plaintiff in 1983.

There were significant disputes as to the manner in which the profits were to be calculated, and it was not possible to compute the amount of the profits without opinion or discretion. This, along with the fact that a reasonable dispute existed as to the plaintiff's right to recover, prevents an award of prejudgment interest.

The defendant further contends that the trial court erred in assessing damages against it that were not sustained by the evidence.

The plaintiff claimed that in determining his share of the profits, depreciation, rent increases, losses on the Trump

account, and bonuses were to be added to the "bottom line" profits. Much of this was disputed by Lee Sapp. Essentially, the evidence presented questions of fact and credibility which were resolved, generally, against the defendant.

In an action at law tried without a jury, it is not the role of this court to resolve conflicts in or reweigh the evidence, and this court will presume that the trial court resolved any controverted facts in favor of the successful party and will consider the evidence and permissible inferences therefrom most favorably to that party.

*Kearney Centre Inv. v. Thomas, ante* p. 21, 25, 424 N.W.2d 620, 623 (1988); *Kubista v. Jordan*, 228 Neb. 244, 422 N.W.2d 78 (1988).

With respect to the Trump account, the trial court found that no losses were attributable to that account and that the amount claimed by the plaintiff as losses for that account and depreciation attributable to that account should not be added.

The defendant's final assignment of error is that the trial court erred in admitting various items into evidence which prevented it from receiving a fair trial.

The defendant first contends that the trial court erred in receiving into evidence the deposition of Lee Sapp. The plaintiff offered the deposition for purposes of impeachment, to which the defendant objected on the grounds that it was not the best evidence. The court overruled the objection and received the deposition for purposes of impeachment.

In its brief, the defendant argues that the deposition was not the best evidence because Sapp had already been on the witness stand for an extensive period of time. This argument fails because the best-evidence rule is completely inapplicable in this context.

The best-evidence rule has nothing to do with whether a deposition may be received after lengthy testimony by a witness in court. The rule applies only when the contents of a writing are sought to be proved. In this case, the deposition was offered only for impeachment purposes. The trial court correctly overruled the defendant's objection.

Next, the defendant argues that the trial court erred in receiving a settlement agreement between the plaintiff and the

defendant pertaining to a matter separate and apart from the issues in this case.

A separate partnership known as Sarpy Limited was formed during the time in which the plaintiff was employed by the defendant. This partnership resulted in litigation, which ended with the settlement agreement. The defendant objected on the basis of relevancy, but the trial court ruled the exhibit admissible on the basis that it related to the credibility of the defendant's witness. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 1985). The fact that the parties agreed in the settlement agreement that the plaintiff was entitled to $75,000 of the proceeds from the liquidation of Sarpy Limited was not relevant to whether the plaintiff was entitled to profits under his employment contract with the defendant. However,

> it is the settled law of this state that there is a presumption that the court, trying a case without a jury, in arriving at a decision, will consider such evidence only as is competent and relevant, and the Supreme Court will not reverse a case so tried because other evidence was admitted, when there is material, competent, and relevant evidence admitted sufficient to sustain a judgment of the trial court. . . . Generally, the admission of incompetent or irrelevant evidence is not reversible error where the cause is tried to the court without a jury.

(Citations omitted.) *Schuller v. Schuller*, 191 Neb. 266, 268-69, 214 N.W.2d 617, 620 (1974).

Next, the defendant alleges that the court erred in receiving exhibits 1 and 13, which were tabulations of what the plaintiff thought the profits of the defendant should have been for 1983 and 1984, respectively. The defendant objected to each exhibit on the basis that it was irrelevant and not the best evidence. The best-evidence rule was inapplicable. As to relevancy, the exhibits illustrated how the plaintiff believed the profits of the company were to be computed in determining his share. The fact that the defendant disputed the award did not make the

exhibits irrelevant.

Finally, the defendant objected to the plaintiff's questioning regarding the amount the plaintiff paid for his stock in Lee Sapp Leasing. The defendant objected on the basis that the evidence was irrelevant. Although irrelevant to the issue of whether a share of the profits was due and owing to the plaintiff, the ruling was not reversible error.

As a part of the judgment, the trial court ordered the defendant to pay an additional $45,234.72 to the clerk of the district court, to be distributed to the common schools of the state.

Section 48-1232 provides:

> If an employee shall establish a claim and secure judgment on such claim under section 48-1231, an amount equal to the judgment shall be recovered from the employer, if ordered by the court, and shall be placed in a fund to be distributed to the common schools of this state.

Under § 48-1232, it is discretionary with the court whether to order the employer to pay to the common school fund an amount equal to the judgment. Since this provision is in the nature of a penalty, we think the discretion should be exercised only in those cases in which there is no reasonable dispute as to the fact that wages are owed or as to the amount of the wages.

Under the circumstances in this case, we think it was error to require the defendant to pay an amount equal to the judgment recovered by the plaintiff for the benefit of the common schools of this state.

The judgment is affirmed in part and in part reversed, and the cause is remanded to the district court with directions to enter a judgment in conformity with this opinion.

The plaintiff is allowed $9,107.73 for the services of his attorney in this court.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.