ROLAND F. WAITE, APPELLANT AND CROSS-APPELLEE, V. A. S. BATTIATO CO., INC., FORMERLY KNOWN AS A. S. BATTIATO CONSTRUCTION CO., INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT, AND A.S. BATTIATO, APPELLEE.

469 N.W.2d 766

Filed May 24, 1991.   No. 89-005.

Richard A. DeWitt and Larry J. Steier, of McGill, Parsonage & Lanphier, P.C., for appellant.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee A. S. Battiato Co.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Plaintiff-appellant, Roland F. Waite, and defendant-appellee A. S. Battiato Co., Inc. (the corporation), entered into an employment agreement in 1966. Among other things, this agreement provided for a yearly bonus to be paid to Waite and provided for a termination bonus to be paid to Waite when he left employment with the corporation. Waite left the corporation's employ on July 31, 1987. Waite later filed suit against the corporation and A.S. Battiato (Battiato) for his yearly bonuses for the fiscal year ending March 31, 1987, and the short period from April 1 to July 31, 1987, and for his termination bonus. The two issues were bifurcated for trial to the district court for Douglas County. At the conclusion of plaintiff's case on the yearly bonus issue, the court granted

Battiato's motion to dismiss. No appeal was taken from that dismissal. Ultimately, judgment in the amount of $1,001,306.75 as Waite's termination bonus calculated under the employment agreement was entered in favor of Waite against the corporation, and judgment in the amount of $132,534.35 was entered in favor of Waite for yearly bonuses due Waite for the year ending March 31, 1987, and the "short year" ending July 31, 1987.

Waite has appealed from the court's judgment on his claim for a termination bonus. The corporation does not cross-appeal from that judgment. Waite also appeals from the judgment on his claim for yearly bonuses on various grounds set out below. The corporation cross-appeals on various grounds, set out below, from the judgment on Waite's claims for yearly bonuses. We affirm the judgment of the trial court in all respects.

With regard to Waite's appeal on the issue of the termination bonus, Waite assigns as error the actions of the trial court in (1) failing to grant Waite's motion for new trial based on newly discovered evidence and (2) finding that "James Grove's appraisals most accurately reflected the value of the subject properties" and adopting the values set out in those appraisals as the court's findings. With regard to Waite's appeal from the judgment entered on the yearly bonus issue, Waite assigns as error the actions of the trial court in (1) finding that his claim was not a claim for wages under Neb. Rev. Stat. § 48-1231 (Reissue 1988) and (2) denying his motion for sanctions.

On the termination issue, the corporation does not contend there was any error in the trial court proceedings. On the yearly bonus issue, the corporation assigns as error the actions of the trial court in (1) finding that the employment agreement between the parties was modified by the actions of the parties, (2) finding that the decisions of defendant's board of directors relating to bonuses was not binding on Waite, (3) finding that certain expenditures were not to be considered in determining Waite's bonus for the year ending March 31, 1987, (4) failing to find that the decision of the corporation's independent accountants as to the computation of Waite's bonus for the year ending March 31 was binding on Waite, and (5) "awarding Waite a bonus for the short year ending July 31, 1987." As

stated above, we determine that none of the assignments of error raised by Waite or the corporation have merit.

The record before us shows the following: Waite was hired by the corporation in 1950 as a laborer. He steadily rose through the corporation ranks, taking over responsibility for most of the corporation's construction operations by the early 1960's. At that time, the chairman of the board, Battiato, relegated most of the construction business to Waite so that Battiato could pursue other business interests. In 1966, Waite was named vice president of the corporation and was elected to the board of directors. In 1968, he was elected president and treasurer. The parties have stipulated that Waite left the corporation's employ on July 31, 1987.

The first issue in this case is whether the case presented to the district court was one in equity or in law. Despite the fact that the traditional distinctions between law and equity have generally been abolished, see Neb. Rev. Stat. § 25-101 (Reissue 1989), those distinctions do control in determining this court's standard of review. See Neb. Rev. Stat. § 25-1925 (Reissue 1989); *Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 209 N.W.2d 177 (1973). In an appeal in equity this court tries factual questions de novo on the record. *In re Estate of Widger*, 235 Neb. 179, 454 N.W.2d 493 (1990). In actions at law, factual findings of the trial court in a jury-waived case have the effect of a jury verdict and will not be set aside unless clearly wrong. See *Central States Health & Life v. Miracle Hills Ltd.*, 235 Neb. 592, 456 N.W.2d 474 (1990).

Waite contended that the action to determine the disputed value of the properties for the purpose of calculating his termination bonus is in the nature of an equitable accounting and should be reviewed de novo. Waite also argued, however, that the action to determine the amounts of his annual bonuses should be viewed as a legal action for a declaratory judgment. Waite contended that he had to style the yearly bonus claim as one for declaratory judgment instead of one for breach of contract because he was still employed by the corporation at the time his petition was filed.

At oral argument Waite conceded that his action to value the disputed properties for the purpose of determining his

termination bonus was an action at law. At that time Waite asked this court to review both of his claims as law issues.

The corporation agrees that Waite's action to value the disputed properties is one at law, but contends in its cross-appeal that the claim seeking the calculation of the annual bonus payments is necessarily one for an equitable accounting because of the complexity of the facts to be determined in the annual bonus calculation.

With regard to the corporation's cross-appeal, on the issue of the yearly bonus payments, this court has held that both accounting actions and actions for declaratory judgment can be deemed either law actions or suits in equity, depending upon the nature of the underlying dispute. In *In re Estate of Widger, supra* at 181, 454 N.W.2d at 496, we said that "[a]n action for an accounting may under one set of circumstances find its remedy in an action at law and under another find it within the jurisdiction of equity." In *Jelsma v. Colonial Penn Ins. Co.*, 232 Neb. 49, 52, 439 N.W.2d 479, 480 (1989), we said that "[a] suit for declaratory judgment is an action sui generis and may involve questions of law or equity or both. [Citation omitted.] Whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature of the dispute."

The dispute on the corporation's cross-appeal is in the nature of an action to determine the amount of a bonus due under an employment contract. We have held that where the essence of the dispute sounds in contract, the action is to be treated as one at law. *Union Ins. Co. v. Bailey*, 234 Neb. 257, 450 N.W.2d 661 (1990).

Both Waite's claim for annual bonus payments and for termination compensation were based on the employment contract, and, therefore, issues of law were presented. In that situation the factual findings of the trial court have the effect of a jury verdict and will not be set aside unless clearly wrong. *Union Ins. Co., supra.* We do not reweigh the evidence but, instead, consider the judgment in the light most favorable to the successful party on each of the issues. That party is entitled to the benefit of every inference which can reasonably be deduced from the evidence. *Id.* Finally, in a bench trial, the judge sitting

as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we do not reweigh the evidence on appeal. *Id.*

I

On the issue of Waite's termination bonus, the employment contract entered into by the parties provided that upon termination Waite would receive 25 percent of any net increase or be liable for 25 percent of any net decrease in the value of all real estate which was owned by the company at termination and which was acquired on or after January 1, 1964. The employment contract further provided that within 60 days of termination, the parties would endeavor to agree upon the fair market value of all of the subject real estate. Disputes as to fair market value were to be resolved by a provision which called for an independent appraisal. The corporation was to select three proposed appraisers, all of whom were to be residents of Omaha and members of the Nebraska chapter of the American Institute of Real Estate Appraisers. From these three names, Waite was to choose the independent appraiser, whose opinion was to be binding upon the parties. The parties were to split the cost of engaging the appraiser.

The parties entered into a comprehensive stipulation before trial. The stipulation set values for two properties, but the parties could not agree on the value of six office buildings and one tract of unimproved land. The stipulation also supplemented the contractual procedure for valuing the disputed properties. It provided that if either party was dissatisfied with the results of the independent appraisal, that party could hire its own appraiser. It further provided for the parties to submit any dispute regarding the appraisals to the courts for final determination.

H. James Grove was selected as the independent appraiser under the original procedure outlined in the employment agreement. He submitted a report in June 1988, valuing the disputed properties using an income approach. He valued the six office buildings at $9,910,000 and the unimproved tract at $149,500, for a total of $10,059,500.

In approximately April 1988, Waite engaged Robert J.

Wilson, a qualified appraiser, to do a separate appraisal. Wilson testified that he completed his appraisal before he received Grove's figures. Wilson valued the six office buildings at $11,835,000 and the unimproved tract at $303,000, for a total of $12,138,000.

In August 1988, the corporation also retained its own expert, Charles A. Rasmussen, also a qualified appraiser. Rasmussen primarily used a sales or market approach as opposed to an income approach. Rasmussen valued the six office buildings at $9,535,000. He also testified that he did not rely on Grove's report. He did not appraise the unimproved land.

At trial, the three appraisers, Waite, and Battiato testified. On October 20, 1988, the court issued its judgment order. The order stated in part:

> By way of clarification for the parties to determine the method reached by the Court in arriving at the above valuations, the Court has adopted the valuations placed upon the properties by the appraiser James Grove, since the Court determines that his testimony and evidence was the most credible of the appraisers who testified in this trial, and therefore the Court has placed great weight in the valuations submitted by the appraiser James Grove.

In an order nunc pro tunc dated October 21, 1988, the court valued Waite's share at $1,001,306.75. This figure represented 25 percent of the net increase in market value of the disputed properties appraised by Grove plus the valuations stipulated.

Waite assigns as errors the court's reliance on Grove's valuations and the court's denial of his motion for new trial.

When this record is viewed as a case at law, there is ample evidence to support the district court's adoption of Grove's valuations. Grove had been an appraiser in Omaha for over 30 years and was a member of the American Institute of Real Estate Appraisers. Both parties stipulated as to his credentials. Grove was the appraiser chosen by Waite's counsel from the list of three appraisers provided by the corporation according to the original employment agreement. Grove had prepared appraisals for one of Waite's attorneys on previous occasions.

Although Grove's valuation of the six office buildings was 16.3 percent lower than the valuation of Waite's expert, Wilson,

Grove's valuation was 3.9 percent higher than that of the corporation's expert, Rasmussen. Waite offers a number of arguments as to why Wilson's appraisal methods were superior to Grove's methods. However, the corporation has as many, if not more, arguments supporting Grove's figures over Wilson's. It is not the province of this court to reweigh the complex and voluminous evidence nor to make determinations as to the credibility of the witnesses. The record shows no clear error on the part of the district court in arriving at its judgment.

Waite's other assignment of error on the termination bonus issue concerns the district court's refusal to grant his motion for new trial on this issue. The primary impetus for this motion was a billing statement sent from Grove to the corporation's counsel a week after the trial. The letter sent with this billing stated, "Here is presented the billing for the trial and pre-trial work in the captioned case, which work was accomplished exclusively for you, Mr. Douglas and Mr. Stouffer." The $1,440 billed to the corporation included "[r]eview of Wilson appraisal reports for areas of weakness and comparative analysis against Grove appraisal reports. Two (2) days @ $420. = $840." Waite stated in his affidavit in support of his motion that he was provided a copy of the letter by the corporation's counsel. Two days earlier Grove had sent each party identical bills for $705, representing each party's one-half share of the cost of Grove's trial testimony and pretrial review of his own appraisal reports.

Waite contends that a new trial should have been granted because the trial court's findings in its judgment order were based on the premise that Grove was a neutral arbitration appraiser and that his opinions were intrinsically more objective. Waite contends that the evidence in the letter shows that Grove was in fact not impartial, and thus the trial court erred in giving "great weight" to his testimony and appraisal reports.

The corporation's counsel contends that Grove was consulted after counsel had received the reports of both Grove and Wilson, in an effort to understand the discrepancy between the valuations in the two reports. The corporation's counsel stated that it needed Grove's assistance in order to be adequately prepared for trial.

The corporation's counsel also argues that Waite was aware at the time of trial that the corporation had consulted Grove independently. In this connection, the bill of exceptions shows the following questions and answers from Grove's testimony on direct examination on the first day of trial, when he was called as a witness by Waite:

Q. [by Waite's counsel] Mr. Grove, after completing and delivering your appraisal reports, or subsequent to that time, have you done any preparation for your appearance today?

A. [by Grove] Sure.

Q. And did you have any meetings with anybody in preparation?

A. Yes.

Q. Who did you meet with?

A. Ah, opposing — your opposing counsel, Mr. Tjaden and —

MR. DOUGLAS: Jack Douglas.

Later, when the corporation recalled Grove as a witness on the second day of trial, the record shows the following testimony by Grove:

Now you ask me to test this, prepare this worksheet. Now related to Mr. Wilson's value estimate . . . .

. . . .

. . . Well, you had asked me to come up with some calculations that show in my opinion the reason for the differences between Mr. Wilson's value and my value. That's what this is designed to do.

. . . .

. . . [T]he basics in the processing of the method in each report indicates, in my opinion, our differences of opinion and why they are like they are. And that's what you asked me to do.

. . . .

. . . Ah, you asked me to review some of his reports, which I did.

The worksheet referred to was marked as two exhibits, each of which contained Grove's penciled notes explaining the difference between his appraisal and Wilson's appraisal. The

following occurred during cross-examination of Grove by Waite's counsel:

Q. Well, as I understand your testimony this morning, based on the work you did for Mr. Douglas last night, as opposed to your report that you did for both parties?

A. Yes.

. . . .

A. . . . The technique that I testified to, the material that Mr. Douglas asked me to work up . . . .

Waite's counsel contend that the references made on the second day of trial referred to some computations Grove did the previous evening for the corporation's counsel to help clarify some of Grove's earlier testimony. Waite's counsel contend that they in no way imagined that Grove had spent 2 full days probing Wilson's reports for "areas of weakness." Reply brief for appellant at 4. The facts remain, however, that on the first day of the trial Waite's counsel knew the corporation's counsel had talked to Grove before the trial and on the second day of trial knew that Grove had prepared pencil memorandums explaining the difference in the valuations. Waite's counsel, knowing those facts, permitted the matter to be submitted to the court for decision and did not challenge Grove's testimony until after the trial court had rendered a decision that Waite did not like.

A motion for new trial on the basis of newly discovered evidence is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Fellman*, 236 Neb. 850, 464 N.W.2d 181 (1991). The proof in support of granting a motion for new trial based on newly discovered evidence must show that such evidence was then available which neither litigant nor counsel could have discovered before by exercise of reasonable diligence. *Federal Dep. Ins. Corp. v. Swanson*, 231 Neb. 148, 435 N.W.2d 659 (1989).

A motion for new trial should be granted only where there is error prejudicial to the rights of the unsuccessful party. *Kumar v. Douglas County*, 234 Neb. 511, 452 N.W.2d 21 (1990). Applications for new trial are to be entertained with reluctance and granted with caution. *Smith v. Erftmier*, 210 Neb. 486, 315

N.W.2d 445 (1982).

In considering this motion, the trial court was in a unique position to judge whether Waite's counsel was aware of the extent of Grove's consultations with the corporation's counsel. The court also was in a position to judge whether Grove's comments should have caused Waite's counsel to inquire further when examining Grove as to the nature of the consultations. Finally, the court was in a position to judge the extent Waite was prejudiced by Grove's consultations with the corporation's counsel.

The question whether ex parte consultation with an expert who has been retained by both parties and who is understood by the parties to be neutral is an acceptable practice need not be decided in this case. In this instance, the determination as to whether the disputed consultation was so prejudicial as to require the granting of a new trial was a matter to be determined within the trial court's discretion. The court's judgment was based not only on the credibility of the testimony, but on the evidence contained in Grove's appraisal reports. Those reports were all prepared and delivered to counsel for both parties before any possible impropriety on the part of the corporation's counsel. Most importantly, as stated above, Waite's counsel was aware of the questioned consultation before the matter was submitted to the court and did not raise the issue. Denial of the motion for new trial was within the discretion of the trial court. There was no error in connection with the determination of Waite's termination bonus.

## II

Waite raises two issues on his appeal on the yearly bonus issue. The court denied his claim for attorney fees under the Nebraska Wage Payment and Collection Act, Neb. Rev. Stat. §§ 48-1228 et seq. (Reissues 1984 & 1988), and Waite contends that determination is erroneous. The parties state that the court denied appellant's motion for sanctions due to an alleged frivolous counterclaim that was dismissed immediately before trial, and Waite contends that denial was erroneous.

The trial court denied Waite's claim for attorney fees under the Nebraska Wage Payment and Collection Act, §§ 48-1228 et

seq. Waite contends that § 48-1231 (Reissue 1988) entitles him to minimum attorney fees of 25 percent of the judgment on the yearly bonus issue, plus 25 percent of the judgment on appeal. Waite also contends it would be appropriate to award a matching amount to the common schools under § 48-1232 (Reissue 1988).

In both contentions, Waite cites *Suess v. Lee Sapp Leasing*, 229 Neb. 755, 428 N.W.2d 899 (1988). In *Suess*, this court held that an employee's share of the profits of his employer under a profit-sharing plan can be wages within the meaning of § 48-1229(3) (Reissue 1984). We have also held that a bonus may be wages under the Nebraska Wage Payment and Collection Act. *Knutson v. Snyder Industries, Inc.*, 231 Neb. 374, 436 N.W.2d 496 (1989).

The business arrangement in this case is distinguishable from the profit-sharing and bonus arrangements in the above-cited cases.

Paragraph 7 of the employment contract provides:

> In the event that any such computation shall disclose that the company sustained a net loss rather than a net profit for any year, then the company shall have the right to deduct from Waite's salary for the following year an amount equal to 25% of such loss. If such salary is not sufficient to cover said 25%, Waite shall pay to the company on demand any portion of said 25% that is not deducted or deductible from such salary.

This sort of an agreement is not a "bonus" as we have used that term in *Knutson v. Snyder Industries, Inc., supra*, nor is it a usual "profit-sharing" plan as defined in *Suess v. Lee Sapp Leasing, supra*. The risk-sharing aspect of the agreement makes it somewhat like a joint venture, although obviously the employment agreement contemplates more than a single transaction.

Although Waite was never a shareholder in the company, his status was also somewhat akin to that of a partner, considering the fact that he shared in 25 percent of all profits and losses. It is also significant that Waite earned well over $1 million in bonuses and was liable on personal guaranties for millions of dollars loaned to the corporation during the time that he served

as an executive officer of the corporation. This type of business relationship is certainly not the typical employment relationship embodying a disparity of economic power that the statute seeks to regulate.

The court is aware that § 48-1229 of the Nebraska Wage Payment and Collection Act defines an employee as "any individual permitted to work by an employer." This definition is broad enough to include Waite. However, we affirm the district court's finding that Waite's bonus did not constitute wages under the act, because the risk of loss associated with those sums prevents them from meeting the definition of wages under § 48-1229(3).

Section 48-1229(3) provides: "Wages shall mean compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis." Using this definition of wages, it is clear that this aspect of Waite's compensation cannot be considered a "fringe benefit" for the purpose of the Nebraska Wage Payment and Collection Act. A benefit has been defined as an "[a]dvantage; profit . . . gain" or "something to advantage of, or profit to, recipient." Black's Law Dictionary 158 (6th ed. 1990). Where an employment agreement provides for the sharing of possible financial losses, sums collected under such a contractual provision are not "benefits" which could be considered "wages" under § 48-1229(3).

Finally, we must consider appellant's argument that he should be awarded attorney fees and costs incurred in defending an alleged frivolous counterclaim dismissed just before trial. There is no evidence in the record of any effort or expense undertaken in defending the counterclaim. We affirm that determination.

## III

We now address the corporation's cross-appeal. The contract provision at issue in this case is denominated as paragraph 6. That provision states:

6. The term "net profits", as used in paragraph 5

hereof, shall mean those net profits actually realized by the company after deduction therefrom of the fixed annual salary due Waite hereunder, taxes (excluding taxes on income) and interest, but without any provision for the depreciation of buildings or other improvements on land and without taking into account any net profits or net losses with respect to any property or assets acquired by the company before January 1, 1964. The books and accounts of the company shall be audited and such net profits shall be computed by the independent public accountant then regularly employed by the company, within ninety (90) days after the end of each year for which net profits are to be determined hereunder. Such computation shall be made in conformity with generally accepted accounting principles and shall be final, binding and conclusive upon the parties hereto. When such computation has been made for each year, the company shall deliver to Waite a full and correct itemized report, duly certified by such accountant, showing the company's net profits for such year, computed in accordance herewith, and Waite's percentage thereof by way of additional compensation and shall remit to him the amount of such additional compensation. In the event of the termination of this agreement during the course of any year, such computation shall be made on a pro rata basis for that fraction of the year up to the date of termination.

The testimony of the parties shows that from 1966 to 1986, the computation of Waite's bonus varied from the above provisions. Both Waite and Battiato testified that in order to avoid the expense of an audit, Waite's bonus was always computed on the basis of a profit-and-loss recap prepared by the corporation bookkeeper. The format for this recap had been in place before Waite's employment with the corporation and had been used in calculating other employees' bonuses. Battiato and Waite would discuss the recap and tentatively determine the 25-percent bonus. The accountant hired by the corporation to compile the corporation's annual financial statements would then go over the books, prepare a draft, and prepare a worksheet. Waite and Battiato would then go

over the final figures with the accountant and all bonuses would be approved.

In 1977, the corporation approved an agreement providing for deferred compensation for Battiato in the case of his death, disability, or retirement. A copy of the minutes of that meeting shows that Battiato assured Waite that the deferred compensation would not affect the computation of Waite's bonus, but that only Battiato's basic salary would be deducted before computation of the bonus, as was the past practice. In the period between 1966 and 1986, no bonuses of any employee, including Battiato, were ever deducted before the computation of Waite's bonus.

On September 17, 1979, Waite entered into an amendment to the 1966 employment contract. In addition to recognizing Waite as president of the corporation, the amendment stated that "[i]n determining 'net profits' under paragraph 5, all ordinary and usual operating expenses, including the fixed annual salary of Roland F. Waite and Anthony S. Battiato shall be deducted."

Waite gave notice in October 1986, that he would be leaving the company. The parties have stipulated that Waite actually left the company on July 31, 1987.

The controversy on the corporation's appeal concerns the computation of Waite's bonus for the fiscal year ending March 31, 1987, and the computation of Waite's bonus for the additional 4 months he was with the corporation up to July 31, 1987.

The evidence shows that the company bookkeeper, then Maralee Battiato, prepared a profit-and-loss recap for the fiscal year ending March 31, 1987, as had been the past practice. The recap showed a net profit of approximately $500,000. However, Waite's bonus was not computed based upon this profit-and-loss recap. Instead, the accountants hired by the company to compile the corporation's annual financial statements prepared an alternative computation of Waite's bonus without any reference to the profit-and-loss recap prepared by the bookkeeper.

Alden Awerkamp of Awerkamp & Associates, the accounting firm retained by the company, testified that in

January or February of 1987, he was approached by Battiato with a copy of Waite's employment agreement. Awerkamp testified that Battiato asked him to review the agreement and give an opinion as to how it should be interpreted. This occurred only a few months after Waite had announced he would be leaving the company. Awerkamp had also reviewed Waite's agreement in 1981, and no changes had been made in the procedure in calculating the bonus after that time.

Awerkamp directed one of his associates, Thomas Schwaller, to review the employment agreement. Schwaller testified that his review of the contract led him to believe that the past bonus computations had not been made in accord with the terms of the employment agreement. Schwaller made his own computations, and they were presented to Battiato. In contrast to the large net profit obtained under the traditional recap computation made by the company bookkeeper, Schwaller's computation showed a net loss.

On March 27, 1987, a special shareholders' meeting was convened. Present at the meeting were shareholders Battiato; his wife, Rose L.; his son, Anthony J. (who by then had been elected vice president and secretary of the corporation); and his daughter, Maralee (who had been made the company bookkeeper on July 3, 1986). Also present were Awerkamp and corporate legal counsel. The first act at this meeting was to remove Waite from the board of directors and replace him with Battiato's daughter. Waite testified that he was not informed that he had been removed from the board until this litigation commenced several months after the meeting. The shareholders then voted to set up an account to charge the substantial impending termination compensation due Waite against net profits. The minutes state that "the account to be established for compensation which may be due Mr. Waite would be taken into account in considerating [sic] the computation of all employees' bonuses."

Immediately following the shareholders' meeting, a special meeting of the board of directors was held with the same parties present. Waite had no notice of either of these meetings. The board authorized substantial bonuses to Anthony J. Battiato and Maralee Battiato. No bonus was authorized for Waite. The

board also estimated the total probable liability due Waite upon termination to be $900,000.

Waite testified that in March 1987 he began to urge Battiato that they should sit down with the bookkeeper and determine the annual bonuses. The bonuses had to be paid by March 31 for tax purposes. Battiato informed Waite that he had already paid the bonuses. Waite testified that when he inquired as to his own bonus, Battiato told him that the accountant would take care of it. Waite testified that in the past he had always delivered the corporation's books to the accountant.

Waite testified that after several evasive encounters, Awerkamp gave him a slip of paper with figures on it that Awerkamp said Battiato had told him to deliver. The slip showed a loss of $27,150.48 for purposes of computing Waite's bonus. Waite rejected that computation and told Awerkamp he wanted a more detailed computation, in the same format as had been used in the past. Awerkamp then delivered a sheet showing a net loss of $47,867.72. Waite testified that Awerkamp told him that he did not know why the two figures differed. Following that encounter, Waite hired counsel and commenced this action.

Both parties adduced evidence during 3 days of testimony on this issue. The court served as the trier of fact. On the issue of the yearly bonus, the court found generally in favor of Waite. Specifically, the court found that (1) the parties entered into an employment agreement dated March 1966 and amended September 17, 1979, providing for a bonus to be paid to the plaintiff in the sum of 25 percent of net profits, as computed by an independent public accountant after the books had been audited; (2) the parties by their actions did not have the books audited during the entire length of the contract but, instead, computed the bonus from a profit-and-loss recap prepared by the corporation bookkeeper; (3) the net profits were determined to be profits actually realized by the corporation after deductions for ordinary and usual operating expenses; (4) the practice of the parties and the manner in which the contract was treated by the parties modified the employment agreement to provide for the computation of Waite's bonus by an unaudited profit-and-loss recap by the corporation

bookkeeper; (5) bonuses were not to be charged against profits before the computation of Waite's bonus, so that the unilateral decision of the board of directors to charge all employees' bonuses against profits and to set up an account to charge deferred compensation as an expense in determining Waite's bonus was of no binding effect on Waite; (6) since the corporation had consistently over the years of the contract computed net profits on income actually realized and expenses actually incurred during the fiscal year, the corporation could not unilaterally change the method of accounting in computing the bonus; and (7) $101,000 in bonuses to the Battiatos, $300,000 of the impending termination payment owed Waite, and $112,664 of income realized in 1987 for the sale of property in 1985 were not to be excluded from income in computing Waite's bonus in 1987. The trial court also found that $40,104 in partnership losses should not have been deducted from net profits in computing Waite's bonus.

The court therefore increased the amount to be used by the corporation in calculating Waite's bonus. The court determined that Waite's share amounted to $126,475.22. The court further determined that the amount of Waite's bonus for the short year ending July 31, 1987, was 25 percent of $24,236.51, or $6,059.13.

The corporation asserts that the trial court's finding that the employment agreement was modified by the parties was an error at law in that the trial court applied a rule of law for the interpretation of ambiguous agreements when the evidence established there was no ambiguity in the agreement as it related to the computation of bonuses. However, the question whether the original written contract contains ambiguities does not arise where the parties have affirmatively modified or assented to change in the specific terms of the agreement.

This court has held that a written executory contract may be modified by the parties thereto at any time after its execution and before a breach has occurred, without any new consideration, and the terms of a written executory contract may be changed by a subsequent parol agreement before a breach thereof. *Pearce v. ELIC Corp.*, 213 Neb. 193, 329 N.W.2d 74 (1982).

In *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 322, 466 N.W.2d 73, 78 (1991), we said:

> A modification of a contract which substantially changes the liability of the parties ordinarily requires mutual assent to be effective. *Grand Island Prod. Credit Assn. v. Humphrey*, 223 Neb. 135, 388 N.W.2d 807 (1986). "[I]t is not essential that the mutual assent of the parties to modify the contract be express . . . it may be implied from acts and circumstances . . . from a course of conduct . . . and from acts of one party in accordance with the terms of a change proposed by the other." 17A C.J.S. *Contracts* § 375 at 427 (1963).

It is undisputed that the parties so acted as to establish an agreement not to compute Waite's bonus on the basis of an audited profit-and-loss statement prepared by a hired accountant, as was required by the original written agreement. Instead the bonus was always computed by a profit-and-loss recap prepared by the corporation bookkeeper. There is sufficient evidence to support the fact that Battiato agreed to the computation of bonuses in this manner and that he in fact went over the numbers before the bonuses were approved. The record supports the trial court's finding that the employment contract was modified to replace the method contemplated by the original written contract with this method of bonus computation. Therefore the court correctly included certain sums under net income for the computation of Waite's bonus that were excluded under the computation presented to Waite.

There are dual criteria for affirming the district court's inclusion in net income for bonus calculation purposes of the $101,000 in bonuses paid to the Battiatos. The testimony at trial was that under the profit-and-loss recap method, no bonuses were to be deducted before the computation of Waite's bonus. Additionally, the 1979 amendment to Waite's employment agreement requires that only ordinary and usual expenses, including fixed salaries, would be deducted before the computation of Waite's bonus.

The court also correctly included in net income the $300,000 which was ordered deducted by the board of directors. This

speculative amount, which the board wished to deduct from net income to reflect its pending termination obligation to Waite, cannot reasonably be considered an "ordinary and usual operating expense" which could be deducted before computation of Waite's bonus. The board of directors is of course without power to unilaterally abrogate the contractual obligations of the corporation. The board therefore could not change the method of computing Waite's bonus without Waite's assent, because such a change would amount to a modification of the contract between Waite and the corporation without Waite's consent.

The argument that the employment contract required that this amount be deducted under "generally accepted accounting principles" is also inapposite. The agreement was modified by the conduct of the parties, so that the bonus was to be computed on the basis of the profit-and-loss recap, and not on the basis of an accountant's audit prepared in accord with generally accepted accounting principles. In addition, Roy Thylin, one of the corporation's experts, testified that generally accepted accounting principles generally apply in the context of presentation of financial reports for use by third parties. He testified that there are no "generally accepted accounting principles" which provide guidance on how to interpret an agreement to determine an employee's bonus.

The corporation alternatively argues that the court must nevertheless accept the decision of the company's independent accountants as binding, because that was also a term of the original employment agreement. But this argument also ignores the court's finding that the agreement was modified with respect to the means of computation of Waite's bonus.

The evidence also supports the court's inclusion of $112,664 from an installment sale in 1985 in net profits for the fiscal year ending March 31, 1987. The court heard testimony to the effect that the entire sale should have been recognized in 1985 under generally accepted accounting principles. However, the court found that the method of bonus computation as modified by the parties based net income on profits actually realized and expenses actually incurred during the fiscal year. The $112,664 payment was not actually realized, that is, received, until the

year ending March 31, 1987. Waite did not receive his share of that payment in 1985. The corporation's counsel conceded at oral argument that Waite's share of that payment was owed him in some manner. Because the agreement of the parties was modified to recognize profits when they were actually realized, the profit on the installment sale was properly included in net profits for the fiscal year ending March 31, 1987.

The district court also found that $40,104 in partnership losses should not have been deducted from net profits for the purpose of computing Waite's bonus. The court found that "[t]he sum of $40,104.00 styled as partnership loss should not be considered in arriving at net profits since this is derived from partnerships between Roland Waite and A.S. Battiato and is not a holding of the corporation and the Court does not recall any evidence to the contrary."

It appears from the record that the court was mistaken in finding that the corporation was not a party to these partnerships. However, the evidence still supports the court's refusal to deduct these losses from net profits before computing Waite's bonus. The figures for losses to the partnerships were computed by tax accounting methods, which differ from accounting methods used to determine profits and losses in compiling financial statements. The partnership tax losses reflect substantial deductions for depreciation on real estate. Deductions for depreciation are specifically excluded under Waite's employment agreement. It was therefore proper to refuse to deduct these amounts in computing Waite's bonus.

We affirm the district court's determination that Waite's bonus for the fiscal year ending March 31, 1987, is $126,475.22. We also affirm the court's finding that Waite's bonus for the short year ending July 31, 1987, is $6,059.13. This latter figure was ascertained by taking 25 percent of the net profits computed under the bookkeeper's profit-and-loss recap for that 4-month period. The district court's total judgment of $132,534.35 on this issue is affirmed.

The judgment of the trial court is affirmed in its entirety.

AFFIRMED.

WHITE, J., dissenting in part.

I disagree with the majority's interpretation of the Nebraska

Wage Payment and Collection Act, Neb. Rev. Stat. §§ 48-1228 et seq. (Reissues 1984 & 1988) in regard to Waite's claim for attorney fees under the act.

Section 48-1229(3) (Reissue 1984) defines wages as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis."

The majority's analysis of the statute is limited to a discussion of whether Waite's bonus constitutes a fringe benefit. I agree that it does not. However, the majority has failed to apply the plain language of the statute, in that Waite's bonus may be considered "compensation for labor or services . . . whether the amount is determined on a time, task, fee, commission, *or other basis*." (Emphasis supplied.)

Waite's bonus certainly fits within this definition. His bonus was part of his compensation for labor or services and was previously agreed to by Waite and the corporation. Waite met the conditions for payment of the bonus, and the bonus was calculated on a basis not specifically mentioned, but not excluded by the statute. The fact that Waite's bonus agreement included risk assumption on his part does not summarily exclude him from the statutory definition.

The majority's statement that this type of business relationship "is certainly not the typical employment relationship embodying a disparity of economic power that the statute seeks to regulate" is not supported by any authority delineating the intent or legislative history of the statute. Absent clear legislative intent to the contrary, we must follow the plain language of the statute. Waite's claim for his bonus fits within the statutory definition, and he should be awarded attorney fees as mandated by § 48-1231 (Reissue 1988).

SHANAHAN, J., joins in this dissent.