DOUGLAS BROWN, APPELLANT, V. CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., APPELLEE.

472 N.W.2d 381

Filed July 19, 1991.   No. 88-1023.

Jerold V. Fennell, of Peter, Peter & Fennell, for appellant.

Warren S. Zweiback and Mary Lou Perry, of Zweiback, Hotz & Lamberty, P.C., for appellee.

Hastings, C.J., Boslaugh, White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ.

Grant, J.

Douglas Brown, plaintiff-appellant, filed his petition, styled "Equity Action," against defendant-appellee, Clayton Brokerage Co. of St. Louis, Inc. (Clayton), seeking relief under Neb. Rev. Stat. §§ 48-1228 et seq. (Reissue 1984), the Nebraska Wage Payment and Collection Act. Plaintiff's original petition had "a written contract of employment" attached to it and alleged that Clayton "intentionally and willfully [refused] to pay wages due plaintiff under the terms of said contract." Clayton filed an "Amended Answer and Counter-Claim." The answer generally denied plaintiff's allegations and alleged that Clayton was entitled to a setoff of $22,848 against any amounts due plaintiff. Clayton's counterclaim alleged that Clayton had paid to plaintiff $22,848 in excess of Clayton's obligation "under the terms of the contract" and sought judgment against plaintiff in that amount. Plaintiff did not reply to defendant's answer. He filed an answer denying the allegations of the counterclaim.

After trial without a jury, the trial court entered its order denying plaintiff relief and granting Clayton judgment on its counterclaim in the amount of $16,968.22 after offsetting certain expenses which the court determined had been erroneously charged by Clayton to plaintiff. Plaintiff timely appealed. In this court he assigns as error the actions of the trial court in (1) failing to order an accounting, (2) finding that the Nebraska Wage Payment and Collection Act was not applicable, and (3) failing to offset certain amounts alleged to have been erroneously charged by Clayton to plaintiff's office, to wit: $10,258.50 for one of plaintiff's brokers' account debits, $1,311 in wages that Clayton did not pay to one of plaintiff's brokers, $10,792.98 in wire and hotline expenses overcharged to plaintiff, and $3,040.83 in office expenses charged to plaintiff after his office was closed. Clayton did not cross-appeal. We affirm.

We first note that the "contract" attached to plaintiff's petition, introduced in evidence without objection as the

contract between the parties and consistently referred to by both parties in the evidence and in their briefs as a contract, is not a contract. Exhibit 1 is a one-page typed document, with handwritten deletions and additions, which appears in its entirety on the following page. The initials on the document were identified as those of Bill Reisner, an employee of Clayton's who supervised the closing of Clayton's branch office in Omaha and negotiated with plaintiff to go to work for Clayton thereafter. His authority is not further described.

The document is obviously not a contract. No party is bound to do anything. Nonetheless, the parties treat this document as a contract and not as an understanding of some oral agreement or as a summary of some fully executed contract not before the court. In our review we will treat the case in the manner in which it was tried in the district court. *Sikyta v. Arrow Stage Lines,* ante p. 289, 470 N.W.2d 724 (1991); *Peterson v. Don Peterson & Assoc. Ins. Agency,* 234 Neb. 651, 452 N.W.2d 517 (1990). As have the parties, we will treat exhibit 1 as the operative contract between the parties.

As a further preliminary matter, we note that plaintiff filed an amended petition on July 25, 1988—27 days after the case was tried and submitted to the court. The trial court's order and opinion were rendered on October 20, 1988. The amended petition set out a "Second Cause of Action" after repeating the allegations of plaintiff's first petition. The second cause of action generally alleges a breach of contract action. The record does not show a responsive pleading by Clayton addressed to the amended petition. The trial court addressed the breach of contract theory in its opinion, and the parties also address it in their briefs. We assume the allegations of the amended petition were considered to be denied by Clayton, and Clayton's affirmative defenses pled in its amended answer were considered as defenses to the amended petition. Further, in view of the fact that both parties and the court treat the affirmative allegations of Clayton's amended answer as controverted, we will ignore the fact that the record does not show that plaintiff filed a reply to Clayton's amended answer. See *Landon v. Pettijohn,* 231 Neb. 837, 438 N.W.2d 757 (1989).

  

COPY

## OMAHA

Douglas Brown

### CONTRIBUTING OFFICE CONCEPT

Clayton will credit the office 70% of gross commission revenue. Of the remaining 30% the following items would be partially subsidized:

Rent:

~~A................................~~d $350 per broker.* }

Administrative Personnel:

$200 per broker.

Communication:

$100 per broker.

Health Insurance:

$100 per broker.

Quotation:

$1,000 per location ~~or actual cost, whichever is less~~. ☐%

These are monthly amounts. The remaining normal P & L expenses would be charges against the 70%. Additionally, Clayton would pay, upon prior consultation and agreement, certain one-time expenses associated with changes necessary to put this operation in effect.

800    500
# ~~$500~~ @ 2 brokers -- ~~$350~~ @ 3 brokers, ~~also~~    350 @ 4 etc.

ACKNOWLEDGEMENT:

Signature: _Douglas Brown_
                    Douglas Brown

Date: _____

CLAYTON BROKERAGE CO. OF ST. LOUIS, INC.

By Its: _____

Date: _____

**EXHIBIT**
/

The record shows the following: Clayton is a commodities brokerage firm with its headquarters in St. Louis, Missouri. Plaintiff was initially employed by Clayton in 1976 as a commodities option trader. He worked for Clayton until 1981, when he quit after a dispute regarding payment of a customer's account deficit. Plaintiff then opened his own business in the Livestock Exchange Building in Omaha as an independent introducing broker with Cargill Investing Service.

In 1984, Clayton closed the office it had maintained in the Livestock Exchange Building. Soon after, plaintiff was approached with an offer to return to work for Clayton as the manager of Clayton's recently vacated Omaha office.

The parties began discussions and eventually agreed that plaintiff would take over operation of the Omaha office on December 1, 1984. It was testified to that exhibit 1, discussed above, was signed in March 1985 at a convention in New Orleans, after plaintiff had already been operating the office since the preceding December.

Clayton operated three types of offices. In its company-owned offices, all employees were paid a set salary or commission. The company was responsible for all expenses and any risk of loss. Another office arrangement was that of an independent introducing broker, who assumed all expenses and all risk of loss in exchange for a predetermined percentage of all commissions generated by the office.

The third arrangement, which was chosen by plaintiff, was known as a "shared office" concept. Under this arrangement, plaintiff received 70 percent of all commissions generated by the office. He was responsible for all ordinary and usual operating expenses, and apparently bore the risk of loss if those expenses exceeded the office's share of commissions. In exchange for its 30 percent, Clayton subsidized certain office expenses, paid payroll taxes, provided health insurance and other employee benefits, and provided some equipment. Clayton would also pay all salaries and expenses, and then would deduct those amounts from the office's 70-percent share of commissions. All commissions were collected by Clayton. Only a small percentage of Clayton's offices operated in this manner.

Plaintiff's operation showed a profit until April 1986, when one of the plaintiff's brokers lost a large account. Commissions dwindled, the office was unable to meet expenses, and the office began incurring debt to Clayton. In November 1986, Clayton closed the Omaha office.

At the trial, 72 exhibits were submitted by the parties. Plaintiff's evidence supported his theories that he was an employee and had been underpaid in his commissions. Clayton's evidence supported its theory that it had paid plaintiff more than required by the contract and that plaintiff was indebted to Clayton on Clayton's counterclaim.

We first address plaintiff's contention that the trial court erred in its refusal to order an accounting. The point is not argued in plaintiff's brief. We have held that this court need not consider assignments of error not argued in an appellant's brief. *State v. Contreras*, 236 Neb. 455, 461 N.W.2d 562 (1990).

Plaintiff next assigns as error the trial court's finding that the Nebraska Wage Payment and Collection Act, §§ 48-1228 et seq., is not applicable to this case. We recently held in *Waite v. A. S. Battiato Co., ante* p. 151, 469 N.W.2d 766 (1991), that where an employment contract provides for the sharing of possible financial losses, sums collected under such a provision are not "benefits" which could be considered "wages" under § 48-1229(3). In this case, the contract between the parties provided for a sharing of possible losses. Clayton agreed to make certain payments to plaintiff, whether plaintiff generated income or not. Plaintiff agreed to make the balance of any required payments, whether the operation generated sufficient money or not. Plaintiff stood to make profits or pay losses depending on his operation of the business. The trial court was correct in holding that the contract between the parties did not come under §§ 48-1228 et seq.

Plaintiff's third assignment of error challenges the district court's refusal to offset various expenses pursuant to the contract. This action is one at law, and thus the factual findings of the trial court have the effect of a jury verdict and will not be set aside unless clearly wrong. *Waite v. A. S. Battiato Co., supra.* We do not reweigh the evidence but, instead, consider the judgment in the light most favorable to the successful party on

each of the issues. That party is entitled to the benefit of every inference which can reasonably be deduced from the evidence. *Id.* Finally, in a bench trial, the judge sitting as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*

First, plaintiff contends that $10,258.50 was improperly charged to the plaintiff's office for one of plaintiff's brokers' account debits. Plaintiff contends that the industry practice is to deduct debit losses from the individual broker in charge of the defaulting customer's account. Clayton adduced evidence that plaintiff requested Clayton to deduct losses from plaintiff instead of the account of his star producer. In its order, the trial court stated:

> Aside from the filing of this suit . . . there was no protest by the Plaintiff at any time concerning these deductions. While I do not rely on the doctrine of estoppel, the Plaintiff's failure to protest these substantial deductions reasonably close to the time they were made supports the finding that more likely than not the Plaintiff agreed to the deductions from his commissions.

We determine that this finding was reasonably deducible from the evidence. There was no error in the court's refusal to offset these deductions.

Plaintiff then contends that the trial court erred in failing to offset $1,311 in wages that the company allegedly did not pay to one of plaintiff's brokers. The practice of the parties was that the company would issue the paychecks, and then the wages for plaintiff's employees would be deducted from the office's share of commissions. Whether or not the paycheck was issued is a question of fact. The court did not allow the offset, thereby finding, in effect, that the check was issued. The evidence is not conclusive either way. The trial court did not err in this regard.

Plaintiff then contends the trial court erred in refusing to offset alleged overcharges for wire and hotline expenses. The wire expense consisted of a rental fee for Teletype equipment and a monthly charge for the telephone wire over which the Teletype information was transmitted. The hotline expense was for an open line between all Clayton offices and traders on the floor of the Chicago exchange. The two expenses were

combined as one on the monthly reports received by plaintiff.

Plaintiff testified, over objection, that the parties orally agreed that the hotline portion of expenses would not exceed $150. The monthly statements consistently showed a charge in excess of that amount. The trial court found that the expenses were owed by plaintiff. There is sufficient evidence to support the trial court's findings.

Finally, plaintiff contends that the trial court erred in failing to offset $3,040.83 in office expenses that the plaintiff alleged were charged to him after the office had closed. The court received an exhibit prepared by an employee of Clayton's which divided the expenses on the November and December 1986 billing statements between those expenses which accrued before the closing of the office and those which accrued after the closing. Clayton conceded that plaintiff was not responsible for the latter amounts. It is apparent that the court found that the expenses before closing were owed by plaintiff under the contract. The trial court was correct in that determination.

At the conclusion of its brief on this appeal, Clayton moved for sanctions for a frivolous appeal under Neb. Rev. Stat. § 25-824(4) (Reissue 1989). We find that the appeal was not frivolous. The motion is denied.

The order of the district court is affirmed.

AFFIRMED.

WHITE, J., concurs.