BRADLEY L. POPPEN AND LAURIE L. POPPEN, APPELLEES, V. RESIDENTIAL MORTGAGE SERVICES, INC., A NEBRASKA CORPORATION, APPELLANT.

556 N.W.2d 49

Filed November 12, 1996.   No. A-95-625.

Donald L. Stern and Arnold J. Stern, of Stern & Stern, for appellant.

Russell S. Daub for appellees.

MILLER-LERMAN, Chief Judge, and HANNON and MUES, Judges.

MUES, Judge.

## INTRODUCTION

Bradley L. Poppen and Laurie L. Poppen sued Residential Mortgage Services, Inc. (RMS), alleging that RMS breached its contract to provide a 7-percent interest rate on the Poppens' mortgage and, instead, provided said mortgage with an 8-percent interest rate. From a judgment against RMS for $18,966, RMS appeals.

## FACTUAL BACKGROUND

RMS is a mortgage broker company. It enters into agreements to provide mortgages to prospective borrowers at a specified interest rate, provided a loan closes within a specified time period. It then sells the mortgages to lending institutions.

Bradley, an accountant and the chief financial officer for an Omaha company, met with Gary Nachman, president of RMS, in mid-August 1993 to discuss a 30-year fixed interest rate loan regarding a newly constructed home. On August 31, 1993, the Poppens and Nachman entered into a written agreement in which RMS agreed to provide a 30-year fixed interest loan at a rate of 7 percent. The agreement provided that "[t]he rate and discount points are both guaranteed for a period of 180 days expiring Mar[ch] 1, 1994." It further provided that after this date, the rate and discount points would "float" until 3 days

prior to closing, at which time they would automatically be locked according to the current market rate or 7 percent, whichever was higher. It also stated that "[i]n consideration of . . . $1320.00, Residential Mortgage Services, Inc. shall grant the ability to re-lock your rate and or points one additional time within sixty (60) days of your anticipated closing date." Finally, the agreement provided that its provisions could not be modified or amended except in writing.

Despite this written agreement, Bradley contends that Nachman orally agreed, during August 1993, to provide this 7-percent interest rate for an additional 10 days, for a total of 190 days. Nachman denies any discussion regarding an additional 10 days occurred.

In November 1993, Bradley contacted RMS to discuss the 10-day extension and spoke with a loan processor, Donna Jorgensen. Bradley offered the following typed message, which is a transcribed message left by Jorgensen on Bradley's answering machine on November 24, 1993: "Hey, Brad, this is Donna from Residential. Gary called in this morning and I asked him about that 10 day leeway, and he said there shouldn't be a problem with that on your lock-in extension. . . ."

Due to a builder's delay, Bradley contacted Nachman on January 10 or 11, 1994, requesting another extension. Nachman agreed to guarantee the 7-percent interest rate for an additional 30 days for $330. Laurie, also an accountant, delivered a check in that amount on January 11, 1994, and received a receipt which stated, "Extended lock." A memorandum written by Laurie on her check stated, "30 day rate lock ext. -till 4/10/94." Nachman did not become aware of this notation until he was sued in this matter. The Poppens increased their loan from $132,000 to $135,200 in approximately February 1994.

Bradley testified that he had other conversations with Nachman on March 29 and 30, 1994, in which Nachman offered him $5,000 and a return of lock fees if Bradley would accept an 8-percent interest rate; however, Bradley never agreed to such terms. Nachman denies any such conversations took place.

At this time, the anticipated closing date for the Poppens' house was March 31, 1994. Bradley testified that on March 30, 1994, he learned from Jorgensen that the Poppens would not be

able to close upon their house because permanent power had not been hooked up. According to Nachman, his attempts to get Commercial Federal Mortgage Corporation to waive this closing requirement were unsuccessful. Nachman testified that he spoke with Bradley on March 30 to tell him that his lock would expire and that while RMS could provide the Poppens a no-cost loan at 8 percent, a loan at 7 percent would cost between $5,000 and $6,000. Bradley denies any such conversation occurred.

The Poppens closed their loan on April 8, 1994. It was at this time, Bradley alleges, that he was first made aware that the loan was for 8 percent rather than 7 percent. Kathryn Tippery, escrow closer for Classic Title Company, testified that the Poppens were surprised and angry when learning of the 8-percent rate. Tippery then contacted RMS, and although she does not recall whom she spoke to, she thinks it was Jorgensen. Jorgensen, however, does not recall speaking to anyone from Classic Title on that day. According to Tippery, the RMS representative told her that the lock-in at 7 percent was good until April 10, 1994. Tippery noted this on a fax cover sheet, and this sheet was admitted into evidence. Tippery further attested that she was told by the RMS representative that the 8-percent rate was caused by the Poppens' failure to comply with a 48-hour notice provision required by Commercial Federal. In fact, upon Bradley's request, Nachman had spoken with Commercial Federal, and this notice requirement had been waived. Nevertheless, without proper authorization to adjust the interest rate, the Poppens closed their loan on April 8, 1994, under protest, at 8 percent.

The Poppens filed suit on May 10, 1994. A second amended petition was filed on September 2 in which the first cause of action asserted that RMS breached its contract to provide a loan at 7 percent until April 10. In their second cause of action, the Poppens alleged deceptive trade practices on the part of RMS. The Poppens requested damages in the amount of $18,966 and attorney fees.

Following a trial on April 25 and 26, 1995, the trial court found for the Poppens on their first cause of action and for RMS on the second cause of action. Specifically, the court found that the original lock-in period set to expire on March 1, 1994, had

been extended an additional 10 days pursuant to the phone call from Jorgensen to Bradley on November 24, 1993. The court also found that on January 11, 1994, the parties extended the lock-in agreement for another 30 days, from March 10 until April 10.

## ASSIGNMENTS OF ERROR

RMS asserts that the trial court erred in finding (1) that the alleged 10-day oral extension of the parties' written agreement was supported by consideration, (2) that the memorandum on the Poppens' check dated January 11, 1994, was binding upon RMS, and (3) that the Poppens sustained their burden of proof as to the extent of their damages and the correct method of calculation.

## STANDARD OF REVIEW

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly erroneous. *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996); *Lee Sapp Leasing v. Catholic Archbishop of Omaha*, 248 Neb. 829, 540 N.W.2d 101 (1995). However, when reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Lee Sapp Leasing, supra*; *Dolan v. Svitak*, 247 Neb. 410, 527 N.W.2d 621 (1995).

## DISCUSSION

*Consideration.*

In its first assigned error, RMS asserts that the trial court erred in finding that the 10-day oral extension on November 24, 1993, of the parties' written agreement was supported by consideration. RMS contends that because this agreement was not supported by consideration, it is invalid and, therefore, that the Poppens' lock-in period ended prior to April 8, 1994.

In fact, it is not clear from the trial court's comments that it found consideration with regard to this 10-day extension. The Poppens argue that the $330 provided consideration to support both the 30-day extension and the earlier 10-day extension. Contrary to the Poppens' position, the trial court clearly viewed the $330 as payment for 30 days rather than 40. The Poppens

make no other argument regarding this issue. Deferring to the trial court's factual findings that an oral agreement took place in which both parties mutually assented to extending the lock-in period 10 days, such an agreement was a modification to the parties' written contract. This disposes of the need for additional consideration.

█ It is well settled that a written executory contract may be modified by the parties thereto at any time after its execution and before a breach has occurred, without any new consideration, and the terms of a written executory contract may be changed by a subsequent parol agreement before a breach thereof. *Waite v. A. S. Battiato Co.*, 238 Neb. 151, 469 N.W.2d 766 (1991); *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 466 N.W.2d 73 (1991), *overruled on other grounds, Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992); *Frenzen v. Taylor*, 232 Neb. 41, 439 N.W.2d 473 (1989); *Cole v. Hickey*, 215 Neb. 728, 340 N.W.2d 418 (1983); *Pearce v. ELIC Corp.*, 213 Neb. 193, 329 N.W.2d 74 (1982); *Havelock Bank of Lincoln v. Bargen*, 212 Neb. 70, 321 N.W.2d 432 (1982). Clearly, the November 1993 phone call occurred while the August 1993 written agreement was executory, since neither side had fully performed its provisions. The effect of this phone call was to modify a term of the prior written contract.

RMS' reliance upon *McGrath v. Paul Logan Motor Co.*, 168 Neb. 254, 95 N.W.2d 543 (1959), does not persuade us otherwise. *McGrath* involved a replevin action in which the plaintiff alleged that a note was not past due because the defendants had orally agreed to extend the due date of the note by 6 months. Finding no consideration for this extension, the Nebraska Supreme Court found the agreement to be void. Unlike the aforementioned cases, however, the facts set forth in *McGrath* do not establish when the oral extension in that case took place. However, it is reasonable to conclude based upon the facts which are provided that the alleged oral extension occurred only after the plaintiff had failed to pay on time, or after he had breached the terms of the written contract. The rule set forth above applies to contracts which have not been breached, which is what we have in this case. Therefore, *McGrath* is distinguishable.

RMS does not seriously challenge the Poppens' ability to orally modify the terms of the written contract. In fact, Nachman admits to orally modifying the agreement; however, he contends that he merely intended to extend the "relock" period from 60 days to 70 days rather than the "lock-in" period from 180 days to 190 days. Furthermore, it appears from the record that the 30-day extension, which neither party contests, was granted orally.

Although RMS does not specifically challenge the court's factual findings in this regard, we briefly note that its findings are supported by the record. The court specifically found that the November 1993 phone call took place. Nachman and Jorgensen testified, however, that the "10 day leeway" referred to therein was with regard to the Poppens' ability to extend their above-mentioned "relock" period from 60 days to 70 days. The trial court did not believe this testimony, noting that Nachman clearly explained the difference between a "relock" and an "extension" and that, with knowledge of these specific terms, Jorgensen specifically referred to a "lock-in extension" in the November 1993 phone call. Tippery's testimony lends credence to the Poppens' position. The court further explained its decision, stating:

> [W]hat I choose to believe in this case is that he [Nachman] was simply in a position where he has so many plates in the air on sticks at the same time, he has people who are agents of his company that are doing things for the company and binding the company, and when he finds out about it, it's just simply too little too late.

Whether an oral modification took place is an issue of fact. See *Omaha World-Herald Co. v. Nielsen*, 220 Neb. 294, 369 N.W.2d 631 (1985). Likewise, whether there is mutual assent raises a question of fact. See *Atokad Ag. & Racing, supra.* As noted earlier, the trial court's factual findings in a bench trial have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996). It is apparent from the record that sufficient evidence was presented from which the trial court could conclude that on November 24, 1993, the parties modified their ini-

tial written agreement, thereby extending the original lock-in period by 10 days.

Neither side contests that the Poppens and Nachman agreed to extend the lock-in period an additional 30 days for $330 in January 1994. The only dispute with regard to this 30 days is when it began to run. Because, as already discussed, the record supports the trial court's conclusion that this period began to run on March 10, 1994, and neither party contests the additional 30-day extension, it is unnecessary for this court to address RMS' second assignment of error, that is, that the trial court erred in finding RMS was bound by the memorandum on the Poppens' check. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994).

*Damages.*

In its third assigned error, RMS challenges the court's determination that the Poppens sufficiently proved damages in the amount of $18,966. Also in its third assigned error, RMS asserts that the trial court applied an incorrect method of calculation when reaching this amount.

The evidence is that an 8-percent mortgage over 30 years will cost $357,137, whereas a 7-percent mortgage over 30 years would have cost $323,816, for a difference of $33,321, or an additional $92 per month for 30 years. The award in this case was reached by discounting $33,321 at 4.5 percent to present value to reach $17,862 and adding this number to the increased amount already paid by the Poppens ($1,104 = $92 \times 12$). Bradley also proposed discounting this amount at 2.78 percent, for which he would need $21,962 to pay an additional $92 per month. Finally, Bradley testified that he could buy an annuity for $15,504 to generate this same amount.

RMS, on the other hand, contends that based on Nachman's testimony, the Poppens should recover only that amount which a 7-percent loan would have cost on April 8, 1994, approximately $7,425, minus the cost of the 8-percent loan on said date, approximately $2,735, or approximately $5,000. That is the amount Nachman claims he told the Poppens of in late March. Of course, a party has a duty to mitigate damages. RMS affirmatively pled failure to mitigate in this case. Apparently, it

is RMS' contention that on the date of closing, the Poppens could have paid approximately $5,000 to obtain a 7-percent loan, with that being the only damages suffered, and that this should limit their damages recoverable at trial. The only evidence that the Poppens knew, or reasonably should have known, of this option is Nachman's testimony that he advised Bradley of such on March 30. Bradley, however, denies any such conversation took place. Moreover, there is no evidence that a 7-percent loan was still available to the Poppens at the time of trial or that the cost to convert the loan remained at $5,000. Whether the Poppens failed to use reasonable efforts to mitigate their damages when faced, on April 8, with the denial of a loan which they had been relying on was a question of fact which the trial court obviously determined against RMS. That finding was not clearly wrong based on the evidence.

A fact finder's determination of damages is given great deference on appeal. See *Schuessler v. Benchmark Mktg. & Consulting*, 243 Neb. 425, 500 N.W.2d 529 (1993).

> "In awarding damages, the fact finder is not required to accept a party's evidence of damages at face value, even though that evidence is not contradicted by evidence adduced by the party against whom the judgment is to be entered. . . . The amount of damages to be awarded is [a determination] solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved."

*Id.* at 443, 500 N.W.2d at 542.

The trial court's award in this case was supported by the record. RMS argues, however, that the Poppens' proof of damages is speculative and conjectural. Specifically, RMS asserts that the Poppens' obligation to pay an additional $92 per month may expire prior to the end of the 30-year term for various reasons including death, illness, relocation, or natural disaster. Further, RMS challenges the use of the 4.5 percent by the trial court.

Both Poppens testified as to their intent to live in this house "forever." Moreover, the trial court was presented with several investment alternatives. The party seeking recovery has

the burden of proving damages with as much certainty as the case permits. *Sesostris Temple Golden Dunes v. Schuman*, 226 Neb. 7, 409 N.W.2d 298 (1987). Such evidence must be sufficient to allow the trier of fact to estimate damages with a reasonable degree of certainty and exactness. *Id.* We believe the Poppens proved damages with as much certainty as the case permitted and that the trial court had sufficient evidence to estimate damages with a reasonable degree of certainty.

■ Aside from factual determinations, RMS also asserts that the trial court applied the wrong method of calculation. In a breach of contract action, the ultimate objective of a damages award is to put the injured party in the same position that the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Larsen v. First Bank*, 245 Neb. 950, 515 N.W.2d 804 (1994). Both parties agree that the measure of damages for a breach of contract to lend money is usually the difference between the contract interest rate and the increased interest rate the borrower is obliged to pay in procuring a new loan. See, *Rubin v. Pioneer Fed. S. & L. Assn.*, 214 Neb. 364, 334 N.W.2d 424 (1983); *Shurtleff v. Occidental B. & L. Ass'n.*, 105 Neb. 557, 181 N.W. 374 (1921). See, also, *Rayman v. American Charter Federal Sav. & Loan Ass'n*, 75 F.3d 349 (8th Cir. 1996).

In *Rubin*, the defendant attacked a jury instruction on the measure of plaintiff's damages which stated:

"The measure of damages in such event would be the difference between that amount which the plaintiff would be required to pay at 14.5% interest on a $400,000.00 loan for the duration of the loan and what he would be required to repay at an interest rate of 15.625% over the duration of the loan."

214 Neb. at 367, 334 N.W.2d at 426. The Supreme Court found that the instruction was erroneous because by including a specific interest rate for a substitute loan, the court withdrew from the jury its right to determine what that rate should be. However, the court in no way criticized the *method* of determining plaintiff's damages as set out in the instruction. Here, the trial court used a similar measure and then reduced it to present value to the benefit of RMS. We find no error in this regard.

RMS asserts, however, that the rule set forth in *Rubin* and *Shurtleff* is inapplicable in this case because RMS is not a lender, but, rather, a mortgage broker. As such, RMS argues, its obligation to the Poppens is contingent upon a number of things beyond RMS' control, i.e., completion of the home within the allotted time. RMS' argument overlooks the fact that its obligation is limited to a certain time period. If a circumstance beyond RMS' control prevents closing by a certain date, RMS is no longer obligated to provide a mortgage. We find the rule set forth in *Rubin* and *Shurtleff* applicable to this case. The trial court's award of damages is affirmed.

## CONCLUSION
An oral modification to an executory contract which has not been breached does not require additional consideration. Further, where the record supports the trial court's award of damages, that award will not be disturbed on appeal.

Affirmed.