# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3461

_____

BLB Aviation South Carolina, LLC

*Plaintiff - Appellee*

v.

Jet Linx Aviation, LLC; Jet Linx Aviation Corporation; Jet Linx Management
Company, LLC

*Defendants - Appellants*

Jamie Walker

*Defendant*

_____

No. 12-3508

_____

BLB Aviation South Carolina, LLC

*Plaintiff - Appellant*

v.

Jet Linx Aviation, LLC; Jet Linx Aviation Corporation; Jet Linx Management
Company, LLC

*Defendants - Appellees*

Jamie Walker

*Defendant*

———————

Appeal from United States District Court
for the District of Nebraska - Omaha

———————

Submitted: November 19, 2013
Filed: May 9, 2014

———————

Before WOLLMAN, COLLOTON, and GRUENDER, Circuit Judges.

———————

GRUENDER, Circuit Judge.

BLB Aviation South Carolina, LLC ("BLB") brought this action against Jet Linx Aviation Corporation; Jet Linx Aviation, LLC; Jet Linx Management Company, LLC (collectively, "Jet Linx"[1]); and Jamie Walker. Jet Linx then counterclaimed. After a bench trial, the district court awarded $163,953.17 in damages to BLB and $158,014.98 in damages to Jet Linx due to the parties' breaches of their agreements. Having ended trial almost where they began it, both parties appeal. We affirm in part and reverse and remand in part.

———————

[1]The parties have not distinguished between these Jet Linx entities for purposes of which entity or entities were parties to the contracts at issue here. We thus adopt the convention for referring to the parties that Jet Linx and BLB used in the pretrial order.

## I. Background

BLB is an aviation company that owns airplanes, some of which are leased for charter flights. BLB is owned by Barry L. Bellue, Sr. ("Barry Bellue") and his son Barry L. Bellue, Jr. ("Lee Bellue"). Jet Linx operates an aircraft charter business. Jamie Walker was an employee of Jet Linx at all relevant times.

In March 2007, Walker sent BLB a letter about the possibility of leasing one or more of BLB's airplanes for Jet Linx's charter services. Shortly thereafter, Lee Bellue and Walker discussed the possibility of BLB purchasing an airplane and leasing it to Jet Linx. To explore this prospect, BLB contacted an aircraft broker about purchasing the type of aircraft that Jet Linx had indicated would be suitable for such a lease. The broker identified such an aircraft, which had a registration number of N400GK ("N400GK").

Prior to purchasing the N400GK, on or about June 20, 2007, BLB and Jet Linx entered into a dry lease agreement for the N400GK ("DLA"). In the DLA, which became effective on August 1, 2007, Jet Linx "guarantee[d] [BLB] a minimum monthly lease payment of $47,100 per month, no matter the number of actual hours flown." Jet Linx, which was responsible for maintenance of the N400GK under the DLA, further agreed that "[a]ll inspections, repairs, modifications, maintenance, and overhaul work . . . will be performed in accordance with the standards set by the Federal Aviation Regulations" and agreed to "maintain all log books and records . . . in accordance with the Federal Aviation Regulations." While Jet Linx was responsible for maintaining the N400GK, BLB was responsible for paying for the maintenance performed on the airplane. On or about August 10, 2007, BLB purchased the N400GK for approximately $1,300,000. BLB also spent approximately $50,000 to refurbish the airplane's interior.

BLB delivered the N400GK to Jet Linx on or about August 24, 2007. However, due to unexpected maintenance issues, the N400GK did not make a charter flight until October 2007. That October, Lee Bellue contacted Walker because BLB had not received any lease payments for the N400GK from Jet Linx. Lee Bellue explained that he was required to make monthly payments of $15,000 to his bank. Jet Linx then paid BLB $15,000. Jet Linx claims that BLB agreed to accept this amount as the full lease payment for August and September 2007.

In addition to the DLA, BLB and Jet Linx also negotiated a lease agreement for Jet Linx to charter one of BLB's existing airplanes, which had a registration number of N789DJ ("N789DJ"). In August 2007, the parties signed a management services agreement for the N789DJ ("MSA"). Pursuant to the MSA, BLB agreed to reimburse Jet Linx for certain expenses for the N789DJ. As with the DLA, Jet Linx agreed in the MSA to "maintain the [N789DJ] in compliance with all applicable Federal Aviation Regulations" and "ensur[e] [that] the aircraft complies with FAA maintenance requirements for accurate record entries." The MSA also provided that Jet Linx "does not assume any liability for damages caused by or resulting from, directly or indirectly, wholly or in part, any failure or fault other than its negligence."

On February 19, 2008, two Jet Linx pilots—James Clark and Shannon Montanye—flew the N789DJ from Omaha, Nebraska to Sioux Falls, South Dakota. Upon arrival in Sioux Falls, Clark performed a post-flight inspection of the airplane. Clark reported that he "pulled the cap on the port engine to find the oil in acceptable levels and replaced the cap and pushed the cap closing trigger in the down position and proceeded to the starboard engine and repeated the process." After Clark's inspection, the airplane was stored in a hangar overnight. Early the next morning, Clark and Montanye prepared the airplane for another flight. However, neither pilot performed a pre-flight inspection. After the plane taxied and was cleared for takeoff, Montanye noticed that the oil-pressure light was illuminated and that the oil-pressure gauge read zero. Montanye alerted an individual in the flight-control

tower of this issue, who suggested that the aircraft taxi off of the active runway. Montanye also called Tony Boatwright, the head of maintenance at Jet Linx, who instructed the pilots to shut down the engine, which they did. Because the oil level in the engine had dropped below the minimum level specified in the airplane's maintenance manual, a mechanic performed a teardown inspection of the N789DJ's engine and then performed necessary maintenance, resulting in significant expenses. The mechanic found a crack in the oil cap, which Boatwright subsequently observed when the oil cap was returned to Jet Linx.

Shortly after the oil-loss incident, Clark and Montanye submitted statements describing the incident to Mike Kopp, Jet Linx's chief pilot. Kopp placed a disciplinary report in Clark's employee file that concluded that the pilots had failed to check the oil and the security of the oil cap on the morning of the flight and had failed to shut down the engine promptly upon realizing that the engine had lost oil pressure. The disciplinary report stated that "[t]he lack of proper preflight and operational procedures in an abnormal situation caused the need for engine removal and inspection as well as generator replacement due to oil damage." The teardown inspection and repair costs totaled $158,014.98. In December 2008, after asking its insurer whether these repairs would be covered, Jet Linx sent an invoice to BLB for this amount, which BLB refused to pay.

Following the oil-loss incident, the parties' disagreements escalated. By mid-2008, Barry Bellue had requested that the N789DJ be returned to BLB, and Jet Linx had informed BLB that it would not renew the DLA under its existing terms. As their contractual relationships came to an end, the parties discussed the outstanding expenses related to the airplanes. On August 6, 2008, Jamie Barrett, a Jet Linx employee, sent a letter to Barry Bellue (the "August 2008 letter") in which Barrett claimed that Jet Linx agreed with Barry Bellue's proposal to end the DLA and reimburse Jet Linx for certain maintenance expenses under the MSA. As part of this purported agreement, the letter detailed that Jet Linx would pay BLB $16,000 per

month for June and July 2008 for the lease of the N400GK rather than $47,100 per month. After deducting the amount Jet Linx calculated that BLB owed to Jet Linx, the August 2008 letter asserted that Jet Linx owed BLB a total of $12,347.50 and enclosed a check for that amount. Two days later, Barry Bellue sent an email to Barrett and Walker, complaining about what he termed the "creative charges" in "our final wrap up." Barry Bellue concluded this email by stating, "You guys are shady and unscrupulous business dudes that talk a noble and sacred line to you[r] unsuspecting clients. I will keep open my options." Nevertheless, on August 14, BLB deposited the check that accompanied the August 2008 letter.

BLB brought this action against Jet Linx and Walker; Jet Linx then counterclaimed against BLB. After a bench trial, the district court concluded that: (1) Jet Linx and BLB did not reach an accord and satisfaction by virtue of the August 2008 letter; (2) Jet Linx breached the DLA by failing to make full lease payments to BLB for each month of the lease term; (3) Jet Linx breached the MSA by "marking up" the cost of maintenance for the N789DJ; (4) Jet Linx breached the MSA and the DLA by failing to maintain the airplanes' maintenance records and part tags, but BLB failed to prove any damages; and (5) BLB breached the MSA by refusing to reimburse Jet Linx for the maintenance expenses it incurred in connection with the oil-loss incident. Jet Linx appeals, and BLB cross-appeals.

## II. Discussion

Because both parties cite state law for the standard of review, we look to state law for the standard of review in accordance with the practice of our prior opinions that considered an appeal following a bench trial in a diversity action.[2] *See, e.g.*, *Pohl*

---

[2]In other cases, we have concluded that the standard of review is a procedural issue that is governed by federal law. *Kramer v. Cash Link Sys.*, 715 F.3d 1082, 1086 (8th Cir. 2013); *see Newberry v. Burlington Basket Co.*, 622 F.3d 979, 983 (8th Cir. 2010). In any event, we discern no difference between the federal and state standards

*v. Cnty. of Furnas*, 682 F.3d 745, 751 (8th Cir. 2012); *John T. Jones Constr. Co. v. Hoot Gen. Constr. Co., Inc.*, 613 F.3d 778, 782-83 (8th Cir. 2010); *see also Access Telecomm. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998) (applying standard of review that both parties argued "[w]ithout deciding the standard-of-review question, which is best left to be resolved in a case in which it is contested"). The parties further agree that Nebraska law governs this diversity action. In an appeal from a bench trial in a law action, "the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong." *City of Scottsbluff v. Waste Connections of Neb., Inc.*, 809 N.W.2d 725, 739 (Neb. 2011). This means that "[w]e do not reweigh the evidence but consider the judgment in a light most favorable to the successful party and resolve evidentiary conflicts in favor of the successful party," who "is entitled to every reasonable inference deducible from the evidence." *Id.* The trial judge "is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 8 (Neb. 2008). For questions of law, including contract interpretation, we "independently review" the trial court's decision. *City of Scottsbluff*, 809 N.W.2d at 739.

### A. Jet Linx's Appeal

#### 1. Accord and Satisfaction

Jet Linx first challenges the district court's finding that the parties did not enter into an accord and satisfaction. Jet Linx contends that the parties entered into an accord and satisfaction to settle their disagreements as evidenced by the parties' discussions preceding the August 2008 letter, the August 2008 letter, and BLB's depositing of the enclosed check.

---

of review as applied here.

"An accord and satisfaction is an agreement to discharge an existing indebtedness by the rendering of some performance different from that which was claimed due." *Peterson v. Kellner*, 513 N.W.2d 517, 519 (Neb. 1994). An accord and satisfaction requires "(1) a bona fide dispute between parties, (2) substitute performance tendered in full satisfaction of the claim, and (3) acceptance of the tendered performance." *Id*. "The key element of accord and satisfaction is the intent of the parties, which, although as a general rule presents a question of fact, becomes a question of law when the evidence creates no conflict as to intent." *Lone Cedar Ranches, Inc. v. Jandebeur*, 523 N.W.2d 364, 369 (Neb. 1994).

Jet Linx contends that its tender of the check to BLB along with the August 2008 letter and BLB's act of depositing the check established an accord and satisfaction as a matter of law. The Nebraska Supreme Court, however, has explained that a defendant's tender of a check that the plaintiff subsequently deposits does not effect an accord and satisfaction unless there is a "condition that the money be accepted as a full payment or not be accepted at all." *Rees v. Huffman*, 384 N.W.2d 631, 635 (Neb. 1986). This "condition must either be recited upon the check or otherwise declared." *Langness v. "O" St. Carpet Shop, Inc.*, 353 N.W.2d 709, 714 (Neb. 1984). Neither the August 2008 letter nor the enclosed check contained such a condition, and Jet Linx has not identified any evidence that this condition was otherwise declared. *See id.* at 713-14 (declining to adopt a rule under which the court would "infer such a condition"). Consequently, we find no error in the district court's conclusion that Jet Linx's tender of the check and BLB's act of depositing the check did not amount to an accord and satisfaction. *See Rees*, 384 N.W.2d at 635.

Jet Linx also argues that Barry Bellue's actions manifested an intent to settle the parties' disagreements on behalf of BLB in accordance with the terms outlined in the August 2008 letter. The district court disagreed. We discern no clear error in this

determination.[3]  The district court's conclusion is consistent with the email Barry Bellue sent immediately after he received the August 2008 letter, in which he told Barrett and Walker that "I will keep open my options."  When asked at trial about this email, Barry Bellue testified, "When I got the letter, I wrote this e-mail immediately[] [to] let them know that I didn't settle anything."  Barry Bellue further testified that he did not know in advance that Jet Linx planned to send the August 2008 letter and that it was a "ploy to try to suggest that I had reached some sort of settlement with them."  Because the trial judge is the "sole judge of the credibility of the witnesses and the weight to be given their testimony," *Eicher*, 748 N.W.2d at 8, this evidence is more than sufficient to conclude that the district court did not clearly err by finding that BLB did not agree to the terms of the August 2008 letter.  As a result, the district court did not err by rejecting Jet Linx's defense of accord and satisfaction.  *See Lone Cedar Ranches*, 523 N.W.2d at 369 (explaining that party claiming an accord and satisfaction must show "that the minds of the parties . . . met").

## 2.  Jet Linx's Failure to Make Full Lease Payments

Because the parties did not settle their contractual disputes, we consider Jet Linx's challenges to the district court's resolution of BLB's claims for breach of contract.  Jet Linx first objects to the conclusion that it breached the DLA by failing to make full lease payments to BLB in August and September 2007 and in June and July 2008, for which the district court awarded BLB $141,400.

---

[3]In its reply brief, Jet Linx insists that we should review the district court's findings of fact with respect to accord and satisfaction *de novo* based upon Neb. Rev. Stat. § 25-1925.  Jet Linx's argument overlooks that this statutory provision applies to "appeals from the district court in suits in equity."  *Id.*  In *Peterson*, where the defendant raised accord and satisfaction as a defense to an action for breach of contract—as Jet Linx does here—the Nebraska Supreme Court determined that the action was one at law and reviewed the trial court's findings of fact with respect to accord and satisfaction for clear error.  513 N.W. 2d at 518-20.

Jet Linx urges us to find that the parties modified the DLA to permit reduced payments for these four months. For August and September 2007, Jet Linx contends that, during a conversation with Walker, Lee Bellue agreed on behalf of BLB to accept only $15,000 as the full lease payment for these months. "[W]here the modification of a contract substantially changes the liability of the parties, mutual assent is required." *Whorley v. First Westside Bank*, 485 N.W.2d 578, 581 (Neb. 1992). Whether a contract was orally modified is a question of fact. *See Omaha World-Herald Co. v. Nielsen*, 369 N.W.2d 631, 637 (Neb. 1985); *see also Poppen v. Residential Mortg. Servs., Inc.*, 556 N.W.2d 49, 53 (Neb. Ct. App. 1996). Walker testified that he and Lee Bellue "negotiated a payment, a short payment of $15,000 a month until the aircraft was actually available for the intended agreement." Contrary to Walker's recollection of their conversation, Lee Bellue denied agreeing to reduce Jet Linx's obligation to make full monthly payments under the DLA for August and September 2007. Because Lee Bellue and Walker recall their conversation differently, the resolution of this issue comes down to a determination of credibility. The district court believed Lee Bellue's testimony and found that Walker's perception of this alleged agreement was based on a misunderstanding of Jet Linx's obligations under the DLA. In light of the deference due to this credibility determination, *see Eicher*, 748 N.W.2d at 8, we find no clear error in the conclusion that Lee Bellue and Walker did not orally modify the DLA to permit a reduced lease payment of $15,000 for August and September 2007.

Jet Linx also argues that the parties modified the DLA to permit reduced lease payments of $16,000 per month for June and July 2008. This purported modification of the DLA is based on the August 2008 letter, in which Barrett stated that Jet Linx agreed to pay BLB $16,000 per month for June and July 2008. As explained more fully above, the district court did not commit clear error by finding that BLB did not agree to the terms of the August 2008 letter. Consequently, the district court's related conclusion that BLB did not agree to modify the DLA to accord with the August 2008 letter is not clearly erroneous either.

-10-

Jet Linx next argues that BLB breached the DLA by not providing an aircraft capable of making charter flights during August and September 2007. Jet Linx relies on the fact that, although BLB delivered the N400GK to Jet Linx on or around August 24, 2007, the N400GK did not make a charter flight in August and September due to unexpected maintenance issues. In arguing that this amounts to a breach of the DLA by BLB, Jet Linx does not identify any language in the DLA that required BLB to provide an aircraft capable of charter flights in order to receive a full lease payment for that month. The DLA makes no provision for delaying, reducing, or in any way altering Jet Linx's monthly payments while the N400GK is undergoing maintenance. Rather, the DLA provides for exactly the opposite, stating that the lease "is made effective as of August 1, 2007" and that Jet Linx "guarantees [BLB] a minimum monthly lease payment of $47,100 per month, no matter the number of actual hours flown." The fact that the N400GK did not make a charter flight in August and September 2007, then, does not amount to a breach of the DLA by BLB.[4]

Jet Linx also argues that the district court erroneously placed on Jet Linx the burden of proving the expenses that BLB saved from the failure of the N400GK to make a charter flight in August and September 2007. This argument overlooks the fact that BLB paid for the maintenance performed on the N400GK during these months—a fact found by the district court that Jet Linx does not dispute. More fundamentally, Jet Linx misapprehends BLB's burden of proving expenses saved. Jet Linx is correct that, under Nebraska law, the plaintiff bears the burden of proving expenses saved as a result of the defendant's breach of contract. *See LeRoy Weyant & Sons, Inc. v. Harvey*, 321 N.W.2d 429, 431 (Neb. 1982). Thus, BLB's burden of proof was to prove expenses that it saved because of Jet Linx's breach of the DLA—as relevant here, expenses saved from Jet Linx's failure to make full lease

---

[4]Jet Linx also urges that BLB anticipatorily breached the DLA. But Jet Linx did not develop this argument in its briefs beyond merely mentioning it. Therefore, we deem it waived. *See Cubillos v. Holder*, 565 F.3d 1054, 1058 n.7 (8th Cir. 2009).

payments in August and September 2007. BLB's burden of proof was not, as Jet Linx claims, to prove expenses that BLB allegedly saved due to the fact that the N400GK did not make a charter flight during these months. Because Jet Linx confuses what BLB had to prove in order to recover damages and offers no argument with respect to BLB's actual burden of proof, we conclude that BLB proved damages from Jet Linx's failure to make full lease payments with sufficient specificity.

For these reasons, we affirm the district court's judgment for BLB with respect to its claim for unpaid lease payments under the DLA and the award of $141,400 to BLB.[5]

### 3. Jet Linx's "Marking Up" of Maintenance Costs

The district court also determined that Jet Linx breached the MSA by "marking up" the cost of maintenance for the N789DJ paid for by BLB, for which the district court awarded BLB $15,774.67. Jet Linx argues that the parties agreed that Jet Linx could mark up the cost of maintenance for the N789DJ.

---

[5] Jet Linx failed to include its remaining defenses to BLB's claim for breach of contract based on unpaid lease payments in the pretrial order as issues for the district court to decide—specifically, its defenses of abandonment, rescission, prevention, failure to comply with a condition precedent, breach of an implied warranty, and waiver. And in its proposed conclusions of law before the district court, Jet Linx asserted that "[t]he matters to be tried are the controverted issues and defenses set forth in the pretrial order." Therefore, the defenses not included in the pretrial order are waived. *See Hartman v. Workman*, 476 F.3d 633, 634 n.3 (8th Cir. 2007); *see also Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304-05 (11th Cir. 2003). Although we have discretion to consider an argument not made to the district court if it is purely legal or if a manifest injustice would otherwise result, we discern no reason here to depart from our general practice of not considering arguments made for the first time on appeal. *See Hartman*, 476 F.3d at 634-35.

When the N789DJ required maintenance during the term of the MSA, Jet Linx initially paid for these maintenance expenses. Because BLB agreed in the MSA that it would ultimately be responsible for these expenses, Jet Linx billed BLB. Rather than charge BLB for the amount it had paid for the maintenance, Jet Linx instead charged BLB for more than that amount. On appeal, Jet Linx does not dispute that it engaged in this practice. Over the term of the MSA, BLB paid Jet Linx $15,774.67 more than Jet Linx incurred for the maintenance of the N789DJ.

Jet Linx does not assert that the MSA as written permitted it to mark up the cost of maintenance. Rather, Jet Linx only argues that the parties agreed to modify the written terms of the MSA to permit this billing practice. This purported modification, Jet Linx argues, was made in exchange for striking a provision from the MSA providing for an operating expense fund. In the copy of the MSA admitted at trial, a provision providing for an "Operating Expense Fund" is indeed struck through. Barrett, a Jet Linx executive, testified that he believed that the parties had negotiated this provision out of the MSA in exchange for allowing Jet Linx to mark up the cost of maintenance. On this point, Lee Bellue testified that there was some discussion about removing the operating expense fund provision from the MSA, but he did not recall removing it in exchange for permitting Jet Linx to mark up the cost of maintenance.

The district court did not reach the issue of whether the parties agreed to allow Jet Linx to mark up the cost of maintenance because it concluded that the parol evidence rule barred evidence of such a modification. "The parol evidence rule states that if negotiations between the parties result in an integrated agreement which is reduced to writing, then, in the absence of fraud, mistake, or ambiguity, the written agreement is the only competent evidence of the contract between [the parties]." *R & B Farms, Inc. v. Cedar Valley Acres, Inc.*, 798 N.W.2d 121, 129-30 (Neb. 2011). In other words, "[t]he parol evidence rule renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a

-13-

written agreement." *Sack Bros. v. Tri-Valley Coop., Inc.*, 616 N.W.2d 786, 791 (Neb. 2000).

Jet Linx does not dispute that the purported modification agreed to by Barrett and Lee Bellue alters the terms of the MSA. Nor does Jet Linx question the district court's conclusion that the MSA is an integrated agreement. In addition, evidence from trial supports the district court's determination that this alleged modification, if the parties actually agreed to it, was an oral agreement reached prior to or contemporaneously with the MSA. The operating expense fund provision is struck through in the signed copy of the MSA, and the MSA does not include a provision for Jet Linx's marking up of the cost of maintenance. Thus, absent fraud, mistake, or ambiguity, the MSA is the only competent evidence of the agreement between Jet Linx and BLB. *See R & B Farms*, 798 N.W.2d at 129-30. Jet Linx does not allege fraud or mistake or argue that the MSA is ambiguous. Accordingly, we affirm the district court's judgment for BLB on this claim.

## B. BLB's Cross-Appeal

### 1. Jet Linx's Failure to Maintain the Maintenance Records and Part Tags

BLB challenges the district court's conclusion that it did not prove its damages arising from Jet Linx's failure to maintain documentation for the maintenance performed on the N789DJ and the N400GK. Under the MSA, Jet Linx agreed to "maintain the [N789DJ] in compliance with all applicable Federal Aviation Regulations" and was responsible for "ensuring the aircraft complies with FAA maintenance requirements for accurate record entries." Similarly, under the DLA, Jet Linx agreed that "[a]ll inspections, repairs, modifications, maintenance, and overhaul work [on the N400GK] . . . will be performed in accordance with the standards set by the Federal Aviation Regulations" and that Jet Linx "will maintain all log books and

records . . . in accordance with the Federal Aviation Regulations." However, BLB's expert testified that when Jet Linx returned the airplanes to BLB, the airplanes' maintenance records did not document all of the maintenance that had been performed during the lease term. Moreover, many of the tags for the parts that were installed during the lease term, which verify the airworthiness of these parts, were missing. Relying on 14 C.F.R. § 91.417, which requires an owner or operator of an airplane to keep certain maintenance records, the district court found that Jet Linx's failure to maintain these maintenance records and part tags amounted to a breach of the MSA and the DLA.

On the issue of damages, BLB's expert testified that in order to rectify the lack of maintenance records and part tags, BLB would need to redo the maintenance that was not documented and would need to recertify the parts without part tags. BLB's expert calculated that these repairs would cost $171,363.37. Despite this evidence, the district court concluded that BLB failed to prove its damages. The court reasoned that the diminution in the value of the airplanes, rather than BLB's cost of repairing the missing maintenance documentation and part tags, was the appropriate measure of BLB's damages and that BLB presented insufficient evidence of diminution of value. As a result, the district court entered judgment for Jet Linx on this claim. BLB argues that it is entitled to damages measured by the cost of repair.

This aspect of BLB's cross-appeal presents the question of whether the proper measure of damages is the cost of repair or the diminution in the value of the airplanes. Under Nebraska law, the determination of whether diminution-in-value damages or cost-of-repair damages is appropriate "depends upon the evidence in the particular case." *Fink v. Denbeck*, 293 N.W.2d 398, 401-02 (Neb. 1980). Where a defect in the performance of a contract can be remedied, the ordinary measure of damages is the cost of repair. Where the defect cannot be remedied, the usual measure of damages is the "difference in value between the thing as represented and

its actual value." *Id.* at 402.[6] This latter rule contemplates instances where there has been substantial compliance with the contract, the plaintiff received substantially the same benefits that it bargained for from the contract as performed, and performance in accordance with the contract is infeasible or possible only at inordinate cost. *See Moss v. Speck*, 306 N.W.2d 156, 157-58 (Neb. 1981). The Nebraska Supreme Court has further explained that the plaintiff is entitled to damages measured by the cost of repair "unless [the defendant] proves affirmatively and convincingly that such construction and completion would involve an unreasonable economic waste." *Id.* at 158 (quoting 5 A. Corbin, Contracts § 488 (1964)); *see also A-1 Track & Tennis, Inc. v. Asphalt Maint., Inc.*, No. A-99-433, 2000 WL 781371, at *5 (Neb. Ct. App. June 20, 2000). Accordingly, cost-of-repair damages are proper unless the defendant establishes that the defect in his performance of the contract cannot be remedied in light of the considerations outlined above.

The district court concluded that the diminution in the value of the airplanes is the proper measure of BLB's damages without undertaking any of the above analysis. However, this measure of damages is appropriate only if Jet Linx first established that the lack of maintenance documentation and part tags cannot be remedied in light of the considerations described above. *See Moss*, 306 N.W. at 157-

---

[6]Although this rule has been applied most often in the context of construction contracts, the Nebraska Supreme Court has applied this rule more broadly, including to a contract for repair. *See Lis v. Moser Well Drilling & Serv., Inc.*, 377 N.W.2d 98, 99-100 (Neb. 1985) (explaining that this rule applies to an "improvement" where the defendant failed to solve a well overflow problem); *see also A R L Corp. v. Hroch*, 268 N.W.2d 101, 103-04 (Neb. 1978) (applying rule where defendant failed to prepare property for paving); 24 Williston on Contracts § 66:17 (4th ed. 2013) (noting that the principles underlying the choice between cost-of-repair damages and diminution-in-value damages "are generally applicable to all kinds of contracts for a particular piece of work"). Although the MSA and DLA are leases for the use of BLB's airplanes, the contractual provisions at issue here require Jet Linx to maintain and repair BLB's airplanes.

58. Absent such a finding, it was error for the district court to choose diminution in value as the appropriate measure of BLB's damages. *See id.* Accordingly, we reverse and remand the district court's judgment for further proceedings not inconsistent with this opinion.

### 2. BLB's Failure to Pay for Maintenance Expenses Arising From the Oil-Loss Incident

BLB also cross-appeals the district court's judgment on Jet Linx's counterclaim for breach of the MSA with respect to the maintenance expenses that Jet Linx incurred in connection with the oil-loss incident involving the N789DJ. Under the MSA, Jet Linx did not "assume any liability for damages caused by or resulting from, directly or indirectly, wholly or in part, any failure or fault other than its negligence." Relying on this provision, the district court determined that Jet Linx's employees were negligent by failing to perform a pre-flight inspection and by failing to shut down the N789DJ's engine immediately but concluded that BLB failed to prove that these instances of negligence caused the damage to the N789DJ's engine, which included the need for a teardown inspection and other engine repairs. As a result, the district court ordered BLB to reimburse Jet Linx for the maintenance expenses arising from the oil-loss incident, calculated to be $158,014.98.

Neither party disputes the district court's conclusions that the MSA incorporates the Nebraska tort-law concept of proximate causation and that BLB bears the burden of proof. "A proximate cause is a cause that (1) produces a result in a natural and continuous sequence and (2) without which the result would not have occurred." *Staley v. City of Omaha*, 713 N.W.2d 457, 466 (Neb. 2006). Although proximate causation can be proved by circumstantial evidence, *Hahn v. Weber & Sons Co.*, 390 N.W.2d 503, 505 (Neb. 1986), proximate causation is not established by evidence that leaves the factfinder with "[s]peculation and conjecture," *King v. Crowell Mem'l Home*, 622 N.W.2d 588, 594 (Neb. 2001). Whether negligence

proximately caused an injury is a question of fact, which we review for clear error. *Bean v. State*, 382 N.W.2d 360, 362 (Neb. 1986).

At trial, BLB did not offer expert testimony about the underlying cause of the loss of oil pressure and engine damage or how a pre-flight inspection would have prevented this engine damage. Instead, BLB relied upon a pilot disciplinary report, Boatwright's testimony, and other circumstantial evidence to support its theory that the pilots' failure to secure the oil cap during a pre-flight inspection led to the loss of oil pressure and engine damage. The district court concluded that BLB presented insufficient evidence connecting the lack of a pre-flight inspection to the engine damage. We cannot say that this conclusion was clearly erroneous.

BLB argues that the district court should have given determinative weight to so-called "admissions" by Jet Linx that its pilots' negligence caused the engine damage. The foremost of these "admissions," according to BLB, was made by Kopp—Jet Linx's chief pilot—in a pilot disciplinary report relating to Clark's handling of the oil-loss incident. This report states: "The lack of proper preflight and operational procedures in an abnormal situation caused the need for engine removal and inspection as well as generator replacement due to oil damage. This has resulted in significant avoidable expense to the company." While probative of proximate causation, this disciplinary report merely reflects Kopp's opinion that the lack of a pre-flight inspection and the delay in shutting down the engine played undefined roles in causing the engine damage. The report does not explain the basis for this opinion. Moreover, when asked at trial whether he had "any proof today . . . that [Clark's] failure to shut down the engine when he did actually caused any damage," Kopp stated that he did not. Furthermore, Kopp wrote this report shortly after the oil-loss incident, well before Jet Linx learned the results of the teardown inspection of the airplane's engine, including the fact that the engine oil cap was cracked—a possible

-18-

alternate cause of the oil loss incident.[7]  Thus, the district court appropriately could have discounted Kopp's conclusory opinion.

BLB also relies on Boatwright's testimony about the oil-loss incident.  At trial, Boatwright agreed that he told the mechanic who performed the teardown inspection that the "engine dipstick was reported not to be secure."  He relayed this information because "there was no doubt in my mind that . . . the oil cap/dipstick was not in the hole," since the onsite mechanic had found the dipstick lying in the engine cowling.  At trial, Boatwright also agreed that, shortly after the oil-loss incident, he told Lee Bellue that it was "possible the oil cap was left loose or left off."  However, Boatwright's comments predate his awareness of the results of the teardown inspection, including the fact that the engine oil cap was cracked.  Because Boatwright's statements did not account for the cracked oil cap, we cannot say that his testimony compels the conclusion that the district court committed clear error.

---

[7]BLB raises two objections to the district court's finding that the oil cap was cracked.  First, BLB asserts that it is not supported by evidence that was admitted at trial.  This argument overlooks Boatwright's testimony that the mechanic found the crack and that Boatwright observed the crack once it was returned to Jet Linx.  Second, BLB urges us to draw an adverse inference from the fact that the oil cap was destroyed by Jet Linx.  However, BLB did not make this spoliation-of-evidence argument to the district court.  BLB elicited brief testimony about Jet Linx's destruction of the oil cap based on its understanding of an FAA requirement and made cursory mention of this testimony in its briefs.  But BLB did not argue that the district court should impose sanctions for spoliation of evidence, which would require "a finding of intentional destruction [of evidence] indicating a desire to suppress the truth." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (quoting *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004)).  Nor did BLB identify spoliation of evidence as an issue in the pretrial order.  We thus discern no reason to depart from our general practice of not considering an argument made for the first time on appeal.  *See Hartman*, 476 F.3d at 634-35.

The final "admission" identified by BLB is Barrett's discussion with Jet Linx's insurer about whether the oil-loss incident was covered under its insurance policy. In a communication with Jet Linx's insurer, Barrett apparently asked the insurer's agent whether there would be coverage if Jet Linx's pilots acted negligently. But in this same communication, Barrett also told the insurer's agent that one of Jet Linx's options was "pass[ing] costs on[] to [the] aircraft owner." Viewed most favorably to Jet Linx, Barrett's equivocal statements to the insurer indicate that Jet Linx simply was exploring whether and under what circumstances the engine damage would be covered under its insurance policy, and they are not determinative of proximate causation.

In addition, BLB's theory of causation fails to confront the simple fact that Clark, one of the pilots of the N789DJ, performed a post-flight inspection on the afternoon before the oil-loss incident. The district court found that this inspection occurred and credited Clark's statement that this inspection consisted of "pull[ing] the cap on the port engine to find the oil in acceptable levels and replac[ing] the cap and push[ing] the cap closing trigger in the down position." BLB does not dispute that Clark performed this inspection. Nor has it identified any evidence that Clark's inspection was deficient in any way. Following this post-flight inspection, the N789DJ was stored in a hangar until its planned flight the next morning. Absent evidence that a pre-flight inspection would have revealed something different from what the post-flight inspection did, there is no reason to believe that a pre-flight inspection would have averted the engine damage. *See Worth v. Kolbeck*, 728 N.W.2d 282, 290 (Neb. 2007) ("[C]onduct . . . is not a proximate cause if the event would have occurred without that conduct."). BLB did not present any such evidence at trial. In its written closing argument before the district court, BLB identified no evidence that explains how a pre-flight inspection would have revealed an issue that did not exist or was not observed by Clark the afternoon before the oil-loss incident. With no evidence connecting the lack of a pre-flight inspection to the engine damage,

the district court was left with only "[s]peculation and conjecture" about proximate causation. *See King*, 622 N.W.2d at 594.

The district court also concluded that BLB failed to prove that the pilots' delay in shutting down the engine proximately caused the engine damage. As with its previous theory of causation, BLB did not offer expert testimony about whether and how the pilots' delay in shutting down the engine led to the engine damage. In light of the evidence presented at trial, we cannot say that the district court's conclusion regarding the delay in shutting down the engine was clearly erroneous. BLB raises three arguments to the contrary. First, BLB contends that the district court overlooked Kopp's disciplinary report for Clark, which indicates that the delay in shutting down the engine played some unspecified role in causing the engine damage. However, as discussed above, the district court appropriately could have discounted the disciplinary report. The report merely contains Kopp's conclusory statement about the causes of the engine damage, and Kopp admitted at trial that he currently has no evidence that the delay in shutting down the engine caused any engine damage.

Second, BLB argues that the district court's finding that there were "seconds of delay" in shutting down the engine amounts to clear error. We disagree. Even though Montanye contacted the flight-control tower and Boatwright before the pilots shut down the engine, BLB has identified no evidence that undermines the district court's finding that Montanye made these calls immediately after she observed the oil-pressure issue. Moreover, even if more than mere "seconds" elapsed, BLB has not pointed us to any evidence suggesting how long the pilots actually delayed shutting down the engine. In fact, Kopp testified that he does not know the length of the delay. Nor can we find any evidence that explains how the actual delay—as opposed to a delay of mere "seconds"—proximately caused the engine damage.

-21-

Third, BLB objects to the inference that the district court drew from Montanye's observation that the oil-pressure gauge read zero when she realized that the engine had lost oil pressure. The district court reasoned that Montanye's observation "suggests" that the engine damage already had occurred by the time that the pilots noticed the oil-pressure issue. This inference—whether reasonable or not—does not affect the district court's ultimate conclusion that BLB failed to prove that the pilots' delay in shutting down the engine proximately caused the engine damage. As such, we cannot say that the district court's proximate-causation determination was clearly erroneous.

For these reasons, we affirm the district court's judgment in favor of Jet Linx on its counterclaim for breach of the MSA and the award of damages to Jet Linx.[8]

## III.  Conclusion

For the reasons set forth above, we reverse and remand the district court's judgment for Jet Linx on BLB's claim for breach of contract in connection with Jet Linx's failure to maintain the maintenance records and part tags. We affirm the district court's judgment in all other respects.

_____

[8]The district court refused Jet Linx's request for prejudgment interest on the amount it paid for maintenance expenses in connection with the oil-loss incident. Jet Linx appeals this conclusion. The parties agree that prejudgment interest is available "when there is no reasonable controversy as to the plaintiff's right to recover and the amount of such recovery." *Archbold v. Reifenrath*, 744 N.W.2d 701, 709 (Neb. 2008). Based upon the above analysis, a reasonable controversy as to Jet Linx's right to recover exists. We thus affirm the denial of prejudgment interest.